**RAYMOND S. and Janet S. as next friends of Joseph S., Plaintiffs,**

v.

**Al RAMIREZ, Director, State of Iowa Department of Education, The Clarion–Goldfield Community School District and Arrowhead Area Education Association V, Defendants.**

No. C 95–3027.

United States District Court,
N.D. Iowa,
Central Division.

March 4, 1996.

Evelyn Ocheltree of Legal Services Corporation of Iowa Mason City, for Plaintiffs.

Assistant Iowa Attorney General Linny Emrich, Des Moines, Iowa, for Iowa Department of Education.

Robert Malloy, Goldfield, Iowa, for School District.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1283

II. STANDARDS FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1284

III. FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1285

IV. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1286
 A. The IDEA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1286
 1. Purpose and substantive provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1286
 2. Judicial review under the IDEA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1287
 B. Plaintiffs' Challenge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1289
 1. The "independent educational evaluation" provision and related regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1289
 2. Notice to the district . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1290
 3. "Public expense" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1291
 a. Deference to agency interpretations . . . . . . . . . . . . . . . . . . . . . . . . . . 1291
 b. The agency's interpretations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1292
 c. The administrative decision in light of agency interpretations . . . . . . . . 1295

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1298

## MEMORANDUM OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

BENNETT, District Judge.

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, aims to provide children with special education needs with "a free appropriate public education." Although the statute mandates a "free" education, this judicial review proceeding seeks to determine who exactly must pay for part of the cost of providing one disabled child with that "free appropriate public education." An administrative law judge determined that the child's insurance carrier, rather than an area education authority or the school district in which the disabled child attends school, should bear the costs of an independent educational evaluation of the child, which agency regulations implementing the IDEA state must, in certain conditions, be provided "at public expense." The court therefore grapples with a question of first impression in this circuit, aided only by administrative rules and sparse judicial and administrative decisions from other circuits, as it seeks to determine what exactly "at public expense" means in this case.

## I. INTRODUCTION AND BACKGROUND

Plaintiffs Raymond S. and Janet S., as next friends of their son Joseph S., filed their complaint in this matter on April 3, 1995, against Defendants Al Ramirez, the Director of the Iowa Department of Education (IDE), Arrowhead Area Education Association V ("the AEA"), and Clarion–Goldfield Community School District ("the School District"). Plaintiff Joseph S., a student in the Defendant School District, has previously been diagnosed with a mental disability, Down's Syndrome, and requires special education services provided by the AEA and the School District. The complaint seeks judicial review of an administrative order of the Iowa Department of Education holding that Defendants are required to pay only that part of the cost of an independent educational evaluation of Joseph S. that is not covered by the Plaintiffs' insurance. This matter is presently before the court on cross-motions for summary judgment.

Plaintiffs first sought relief from the AEA's and the School District's refusal to pay *any* part of the cost of Joseph's independent educational evaluation in administrative proceedings before an administrative law judge of the IDE. A due process hearing before the administrative law judge was held over two days, August 13, 1994, and August 30, 1994. On October 18, 1994, the administrative law judge issued her decision in the case. The administrative law judge's conclusion was as follows:

> The parents are entitled to receive an independent evaluation of the child at public expense, pursuant to 34 C.F.R. § 300.503 (1993). If they have not already done so, the District/AEA is required to pay for the comprehensive independent evaluation Joseph received at the University of Iowa, Division of Developmental Disabilities in January of 1994.

*In re Joseph S,* Admin.Doc. SE–117 (Oct. 18, 1994 Iowa Dept. of Educ.). However, the administrative proceedings did not end there.

The AEA filed a motion for clarification of the administrative law judge's October 18, 1994, order. The administrative law judge held another hearing on February 28, 1995, following which she issued a supplemental order, dated March 3, 1995. The administrative law judge concluded in her supplemental order that the AEA was required to pay only that portion of Joseph's educational evaluation which was not covered by Plaintiffs' insurance. Plaintiffs then brought this action for review of the administrative law judge's determination.

In Count I of their complaint, Plaintiffs assert that, under the IDEA, Defendant Iowa Department of Education erred in not ordering the AEA and the School District to pay the full costs of Joseph's independent educational evaluation. In Count II, Plaintiffs contend, again under the IDEA, that Defendant Iowa Department of Education erred in concluding that 34 C.F.R. § 300.301 requires Plaintiffs to utilize some of their limited medical insurance benefits for Joseph to pay for the independent evaluation. Thus, in this litigation, the dispute centers not on the propriety of the independent educational evaluation obtained by Joseph's parents, but instead on whether Joseph's parents are required to look to their private health insurance, rather than to the AEA or the School District, to pay for the independent educational evaluation.

Plaintiffs dismissed their claims against the AEA on September 21, 1995, after the AEA agreed to a settlement under which it would pay $3,500.00 towards the costs of Joseph's independent educational evaluation. Plaintiffs moved for summary judgment against the remaining Defendants on January 2, 1996, asserting that the Defendants' failure to pay the full costs of Joseph's independent educational evaluation violates the IDEA by denying Joseph a free appropriate education. Defendants Ramirez and the School District have resisted Plaintiffs' motion and have filed their own motions for summary judgment, Ramirez on January 12, 1996, and the School District on January 31, 1996. In their motions for summary judgment, these Defendants contend that Plaintiffs are not entitled to reimbursement for the costs of the evaluation paid by Joseph's insurer. A hearing on the cross-motions for summary judgment was held on February 23, 1996. At the hearing, Plaintiffs were

represented by counsel Evelyn Ocheltree of Legal Services Corporation of Iowa in Mason City. Defendant Iowa Department of Education was represented by Assistant Iowa Attorney General Linny Emrich of Des Moines, Iowa. Defendant School District was represented by counsel Robert Malloy of Goldfield, Iowa. This matter is now fully submitted, and the court therefore turns first to the standards applicable to disposition of motions for summary judgment.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 ((8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir. 1992).

The standard for granting summary judgment is well established. *Rule 56* of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits

for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(a), (b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).

Unlike most summary judgment motions, which turn on whether or not the nonmoving party can demonstrate that there is a genuine issue of material fact for trial, *see, e.g., Fed.R.Civ.P.* 56(e) (nonmoving party must designate "specific facts showing that there is a genuine issue for trial"); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325, no party here asserts that any dispute of facts precludes summary judgment in this case. Instead, both Plaintiffs and Defendants Ramirez and the School District contend that their motions for summary judgment can be disposed of as a matter law, because they involve questions of statutory interpretation. Whatever deference is accorded an agency's interpretation of a statute, interpretation is a question of law, not of fact. *See, e.g., City of St. Louis v. Department of Transp.,* 936 F.2d 1528, 1533 (8th Cir.1991) ("The agency's interpretation of its

governing statutes presents, of course, a question of law, and courts normally review questions of law de novo, but ... [t]he Supreme Court has many times made clear that this sort of question of law is [often] for the agency to decide, so long as its interpretation of the statute is reasonable," citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 864–66, 104 S.Ct. 2778, 2792–93, 81 L.Ed.2d 694 (1984)). The court's disposition of the cross-motions for summary judgment in this case will therefore turn solely on questions of law.

### III. FINDINGS OF FACT

Although the parties do not assert that any genuine issue of material fact precludes summary judgment in this action, the court nonetheless makes the following findings of fact, based on the statements of fact as submitted by the parties, to establish the factual background in which this litigation proceeds.

Plaintiffs Raymond S. and Janet S. are residents of the State of Iowa, and are the parents of Plaintiff Joseph S. Defendant Al Ramirez is the Director of the Iowa Department of Education (IDE). The IDE is charged with the responsibility of implementing and administering the State of Iowa's educational system. Of specific interest in this case is the IDE's responsibility for overseeing the special education provided to children in Iowa's public schools.

Defendant AEA has been established pursuant to Iowa law, with the intent that this and other area education agencies "provide an effective, efficient, and economical means of identifying and serving children ... who require special education." *See* Iowa Code § 273.1. AEA has contracted with Defendant School District to provide special education services to students in the School District. Thus, in this case, the School District is ultimately responsible for providing special education services to students in the School District.

Joseph, who is now a student in the School District, was born on January 26, 1986, and was subsequently diagnosed with a mental disability, Down's Syndrome,[1] with a secondary diagnosis of developmental delays and communication deficits. During the 1993–94 school year, Joseph attended the regular kindergarten in the School District with certain modifications. He received related services from the AEA, including a teacher's aide to assist him.

During the fall of 1993, Joseph experienced behavior problems, which caused concern to his teachers and the staffing team. In order to address these concerns, Joseph's parents scheduled an education evaluation of Joseph with the Division of Developmental Disabilities at the University of Iowa Hospital School in Iowa City, Iowa. Joseph's parents did not notify the School District prior to scheduling the evaluation. Joseph attended a nine-day inpatient program at the University of Iowa Hospital from January 10, 1994 through January 21, 1994. The evaluation was for educational purposes only, and was conducted by qualified examiners at the University of Iowa Hospital.

The total cost of Joseph's educational evaluation at the University of Iowa was $7,284.65. Plaintiffs' private health insurance covered all but $725.40 of this cost. The health insurance policy covering Joseph has a one million dollar lifetime cap on benefits. The amount paid for Joseph's evaluation reduced his lifetime maximum benefits to $918,068.65. Plaintiffs also incurred transportation and meal expenses totaling $769.65. Plaintiffs did not request that either the School District or the AEA pay for the evaluation prior to obtaining it or prior to submitting the claim to Joseph's insurer for payment.

---

1. Down's Syndrome is "a chromosomal dysgenesis syndrome consisting of a variable constellation of abnormalities caused by triplication or translocation of chromosome 21. The abnormalities include mental retardation, retarded growth, flat hypoplastic face with short nose, prominent epicanthic skin folds, small low-set ears with prominent antihelix, fissured and thickened tongue, laxness of joint ligaments, pelvic dysplasia, broad hands and feet, stubby fingers, and transverse palmar crease. Lenticular opacities and heart disease are common. The incidence of leukemia is increased and Alzheimer's disease is almost inevitable by age 40." STEDMAN'S MEDICAL DICTIONARY (26th ed. 1995) 1728.

Following Joseph's evaluation, a discharge meeting was scheduled. The purpose of the discharge meeting was to discuss recommendations for Joseph's educational program at the School District. Although it is unclear from the record how or when they were notified of the meeting, it is undisputed that several members of the staff from the School District and the AEA attended the discharge meeting, and that many of the recommendations discussed at the discharge meeting were adopted and implemented by Joseph's teachers and teacher's aides. Joseph showed significant improvement in behavior in the spring of 1994.

By order of the state administrative law judge, the School District and the AEA were ordered to pay Plaintiffs for the costs not covered by insurance in the amount of $725.40, and to reimburse the Plaintiffs for transportation and meal expenses totaling $769.65. The administrative law judge's order that these Defendants pay these costs is no longer at issue here. Plaintiffs have also received $3,500.00 pursuant to a settlement agreement with Defendant AEA. At the hearing on the motions for summary judgment, Plaintiffs' counsel represented to the court that Plaintiffs had turned over to Joseph's insurance provider all of the $3,500.00 recovered from Defendant AEA pursuant to the settlement agreement.

### IV. LEGAL ANALYSIS

The court finds it useful to begin its legal analysis with a brief examination of the purpose of the IDEA, the procedures for challenges under the IDEA, and the procedures under the IDEA which enable parents of a disabled child to obtain an independent evaluation of the child at public expense. The court will then turn to the question of whether Joseph's parents are required to use some

of the limited benefits available under Joseph's health insurance to pay for the independent educational evaluation of Joseph obtained in January of 1994 at the University of Iowa Hospital School, or whether Defendants should instead bear the costs of the evaluation that have thus far been borne by the Plaintiffs' health insurer.

### A. The IDEA

#### 1. Purpose and substantive provisions

In passing the IDEA, Congress's goal was that "all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c); *Florence County Sch. Dist. Four v. Carter ex rel. Carter,* 510 U.S. 7, ——, 114 S.Ct. 361, 365, 126 L.Ed.2d 284 (1993) (the purpose of the IDEA is "to ensure that children with disabilities receive an education that is both appropriate and free."); *School Comm. of Burlington v. Department of Educ. of Mass,* 471 U.S. 359, 373, 105 S.Ct. 1996, 2004, 85 L.Ed.2d 385 (1985) (same); *Light v. Parkway C–2 Sch. Dist.,* 41 F.3d 1223, 1226 ((8th Cir.19 Cir.1994) (quoting § 1400(c) of the IDEA as codifying Congress's goal), *cert. denied,* —— U.S. ——, 115 S.Ct. 2557, 132 L.Ed.2d 811 (1995); *W.B. v. Matula,* 67 F.3d 484, 487 (3d Cir.1995) (quoting § 1400(c) of the IDEA as codifying Congress's goal); *Andress v. Cleveland Indep. Sch. Dist.,* 64 F.3d 176, 178 (5th Cir.1995) (quoting § 1400(c) of the IDEA as codifying Congress's goal); *Dell v. Board of Educ., Tp. High Sch. Dist. 113,* 32 F.3d 1053, 1055 (7th Cir.1994) (citing *Florence County Sch. Dist. Four,* 510 U.S. at ——, 114 S.Ct. at 365, and *School Comm. of Burlington,* 471 U.S. at 373, 105 S.Ct. at 2004).[2] To meet this goal, Congress provid-

**2.** Although the goal of the IDEA has remained consistent throughout its history, the act providing for and protecting the rights of disabled children to public education has gone through a number of metamorphoses. The IDEA came into being in 1970 as the "Education of the Handicapped Act." Pub.L. 91–230, Title VI, § 601, April 13, 1970, 84 Stat. 175. Significant additions to the EHA were made in 1975 with the passage of the "Education for All Handicapped Children Act of 1975," or EAHCA. Pub.L. 94–142, § 3(a), November 29, 1975, 89 Stat. 774.

In 1986, another significant amendment to the act was embodied in the "Handicapped Children's Protection Act of 1986," or HCPA. Pub.L. 99–372, § 1, Oct. 8, 1986, 100 Stat. 796. This was followed, in 1988, by the passage of the "Handicapped Programs Technical Amendments Act of 1988," or HPTA. Pub.L. 100–630, § 1, Nov. 7, 1988, 102 Stat. 3289. In 1991, the current form of the act was passed, Pub.L. 102–119, October 7, 1991, 105 Stat. 587, in part officially changing the name of the act by substi-

ed federal funds to "assist State and Local efforts to provide programs to meet the educational needs of handicapped children in order to assure equal protection of the law." 20 U.S.C. § 1400(b)(9); *see Holland v. District of Columbia*, 71 F.3d 417, 418 (D.C.Cir. 1995). In this respect, the IDEA is like its predecessor, the Education For All Handicapped Children Act of 1975 (EAHCA). *Light*, 41 F.3d at 1226 (IDEA, like EAHCA, provides federal funds to states whose policies "assure[ ] all children with disabilities the right to a free appropriate public education," citing 20 U.S.C. § 1412(1)).

To receive federal funding, however, the participating states must comply with the IDEA's procedures guaranteeing a reasonable probability of educational benefits and supportive services at public expense. 20 U.S.C. § 1412; *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3041–42, 73 L.Ed.2d 690 (1982); *Johnson v. Bismarck Pub. Sch. Dist.*, 949 F.2d 1000, 1002 ((8th Cir.1991) ("The [IDEA] provides federal funding to state and local agencies for the education of handicapped children and conditions that funding upon compliance with extensive procedural and substantive requirements," citing generally

*Hendrick Hudson Dist. Bd. of Educ.*). The education provided each disabled child must be uniquely "appropriate" for the child's educational needs; therefore the state must prepare an "individualized education program," or IEP, for each child through joint participation of the local education agency, the child's teacher, and the child's parents. 20 U.S.C. §§ 1401(a)(18)–(20), 1412(4), 1414(a)(5); *Johnson*, 949 F.2d at 1002; *see Holland*, 71 F.3d at 418 ("To qualify for the federal assistance, a participating state must guarantee all children with disabilities the right to a free appropriate public education ("FAPE"), [20 U.S.C.] § 1412, in accordance with an individualized education program ("IEP") developed by people familiar with the child's needs, *see id.* § 1414(a)(5).").[3] In order to receive the special education mandated by IDEA, a child must first be classified as either "handicapped" or "disabled." *Andress*, 64 F.3d at 178.[4]

### 2. Judicial review under the IDEA

Section 1415 of the IDEA establishes procedures for challenges to the provision of appropriate educational programs to disabled children through a series of administrative

---

tuting "Individuals with Disabilities Education Act" for "Education of the Handicapped Act." Pub.L. 102–119, § 25(b). This change in names had been largely achieved in amendments in 1990, which provided that "Any other Act and any regulation which refers to the Education of the Handicapped Act shall be considered to refer to the Individuals with Disabilities Education Act." Pub.L. 101–476, § 901(a)(3). In light of this amendment, this court will consistently refer to all of these acts as "the IDEA" unless pointing out specific changes inaugurated by one of the other differently named acts.

In addition to these named acts, the underlying act was also amended in 1974, by Pub.L. 93–380, Aug. 21, 1974, 88 Stat. 579; in 1977, by Pub.L. 95–49, June 17, 1977, 91 Stat. 230; in 1983, by Pub.L. 98–199, Dec. 2, 1983, 97 Stat. 1357; in 1990, by Pub.L. 101–476, Oct. 30, 1990.

3. "FAPE" is defined as:
special education and related services that—
(A) have been provided at public expense, under public supervision and direction, and without charge,
(B) meet the standards of the State educational agency,
(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

(D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.
20 U.S.C. § 1401(18). "Related services" are statutorily defined to mean:
transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.
20 U.S.C. § 1401(a)(17); 34 C.F.R. § 300.16.

4. Once a child has been so identified, he or she must be reevaluated at least every three years, to determine the child's continuing eligibility for special education. 34 C.F.R. § 300.534; *see Andress*, 64 F.3d at 178.

levels,[5] culminating in a right to challenge administrative decisions through a civil action in either state or federal court. 20 U.S.C. § 1415(e)(2).[6] The statute states an unusual standard of review as compared with other provisions for review of agency actions:

> In any action [for judicial review] brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2). Because of the statutory language found in section 1415, "judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1471 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994).

 The Supreme Court has stated that this unusual statutory standard of review for agency actions under the IDEA is, however, "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3050. Rather, upon judicial review, the courts examine the "obligations, largely procedural in nature, which are imposed upon recipient States by Congress," and may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051; *Dell,* 32 F.3d at 1057. Thus, the Supreme Court has clarified the scope of and the steps in a court's review under the IDEA:

> [A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley,* 458 U.S. at 206–207, 102 S.Ct. at 3051. In attempting to harmonize the potentially conflicting conclusions drawn in the two steps of the inquiry, the court must "give 'due weight' to the results of the administrative decisions." *Board of Educ. of Murphysboro Community Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ.,* 41 F.3d 1162, 1166 (7th Cir.1994) (hereinafter *"Board of Educ. of Murphysboro"*). The reason for the remaining deference afforded agency decisions is " '[b]ecause judges are not trained educators.' " *Dell,* 32 F.3d at 1058 (quoting *Board of Educ. of Community Consol. Sch. Dist. No. 21 v. Illinois State Bd. of Educ.,* 938 F.2d 712, 715 (7th Cir.1991), *cert. denied,* 502 U.S. 1066, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992)).

Following *Rowley,* the United States Courts of Appeals have consistently held that district courts should apply "an intermediate standard of review ... a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review." *Lenn v. Portland Sch. Comm.,* 998 F.2d 1083, 1086 (1st Cir.1993); *see Colin K. by John K. v. Schmidt,* 715 F.2d 1, 5 (1st Cir.1983) (holding that trial court's review "is to be something short of a complete de novo review of the state educational program."); *G.D. v.*

---

**5.** For an extensive discussion of the administrative or procedural protections established by the IDEA for the education of disabled children, *see, e.g., Light,* 41 F.3d at 1227; *Dell,* 32 F.3d at 1055.

**6.** Section 1415(e)(2) provides, in pertinent part: (2) Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and

any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

20 U.S.C. § 1415(e)(2)

*Westmoreland Sch. Dist.,* 930 F.2d 942, 945 (1st Cir.1991) (holding that "the trial court's review 'is to be something short of a complete de novo review of the state educational program.'") (quoting *Schmidt,* 715 F.2d at 5); *Christopher W. v. Portsmouth Sch. Comm.,* 877 F.2d 1089, 1094 (1st Cir.1989) (same); *see also Lachman v. Illinois State Bd. of Educ.,* 852 F.2d 290, 297 (7th Cir.1988) ("in reviewing the decision of the court below, we, like the district court, must take great care to avoid displacing the educational policy judgments made by appellees."), *cert. denied sub nom. Lachman ex rel. Lachman v. Illinois State Bd. of Educ.,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988).

 Two further points about the standard of review under the IDEA are pertinent here. First, to be preserved for judicial review, issues must first be presented to the administrative hearing officer. *David D. v. Dartmouth Sch. Comm.,* 775 F.2d 411, 424 (1st Cir.1985), *cert. denied sub nom. Massachusetts Dept. of Educ. v. David D.,* 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986). The court finds that, in this case, the hearing officer was presented with the precise issues upon which the Plaintiffs have mounted their complaint seeking judicial review. Second, even under the unusual standard of review for IDEA cases, issues of law from administrative decisions are reviewed de novo. *See Dell,* 32 F.3d at 1058. Thus, the peculiarities of review of administrative decisions under the IDEA do not affect this court's essential task of reviewing the agency's interpretations of a statute, rather than the more typi-

cal factual questions that might have been presented had the Plaintiffs' challenge here been to the Defendants' individualized educational plan developed after the independent educational evaluation.

### B. Plaintiffs' Challenge

At the center of this controversy is the question of who should pay for an independent educational evaluation of Joseph S. The Plaintiffs challenge the administrative law judge's determination that the Plaintiffs' insurer should bear the brunt of the costs of the evaluation. Whether or not the administrative law judge's determination can stand depends on the proper interpretation of the statutory provision that states the right to an independent educational evaluation, and regulations promulgated by the agency, which recognize that to serve the goals of the IDEA, under proper conditions, the independent educational evaluation must be "at public expense."

### 1. The "independent educational evaluation" provision and related regulations

The IDEA requires that states establish procedures which enable parents of a disabled child to obtain "an independent evaluation of the child." 20 U.S.C. § 1415(b)(1)(A). Agency regulations governing independent educational evaluations are set out in 34 C.F.R. § 300.503, and these regulations specify the conditions under which parents have a "right" to such an evaluation "at public expense." [7] The IDE has established conform-

---

7. Section 300.503 provides:

 (a) *General.* (1) The parents of a child with a disability have the right under this part to obtain an independent educational evaluation of the child, subject to paragraphs (b) through (e) of this section.

 (2) Each public agency shall provide to parents, on request, information about where an independent educational evaluation may be obtained.

 (3) For the purposes of this part:

 (i) "Independent educational evaluation" means an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question.

 (ii) "Public expense" means that the public agency either pays for the full cost of the evaluation or ensures that the evaluation is

otherwise provided at no cost to the parent, consistent with § 300.301.

 (b) Parent right to evaluation at public expense. A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency. However, the public agency may initiate a hearing under § 300.506 to show that its evaluation is appropriate. If the final decision is that the evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at public expense.

 (c) Parent initiated evaluations. If the parent obtains an independent educational evaluation at private expense, the results of the evaluation—

ing procedures in 281 Iowa Admin.Code R. 41.109.[8] It is uncontested that Joseph's parents had the right to an independent educational evaluation performed at public expense if they disagreed with the results of an evaluation performed by the School District. *See* 34 C.F.R. § 300.503; *Evans v. District No. 17 of Douglas County,* 841 F.2d 824, 830 (8th Cir.1988); *accord Board of Educ. of Murphysboro,* 41 F.3d at 1169; *Hudson by and through Tyree v. Wilson,* 828 F.2d 1059, 1065 (4th Cir.1987) (hereinafter "Hudson"). Although the school district can challenge the private testing at a due process hearing, the parents' right to obtain the independent educational evaluation at public expense will be denied, and the district will therefore escape an obligation to pay for the independent educational evaluation, only if the administrative law judge determines that the district's initial evaluation was appropriate. *Board of Educ. of Murphysboro,* 41 F.3d at 1169; *Hudson,* 828 F.2d at 1065. There has been no finding here that the School District's initial evaluation was appropriate, thus

> (1) Must be considered by the public agency in any decision made with respect to the provision of FAPE to the child; and
> (2) May be presented as evidence at a hearing under this subpart regarding that child.
> (d) Requests for evaluations by hearing officers. If a hearing officer requests an independent educational evaluation as part of a hearing, the cost of the evaluation must be at public expense.
> (e) Agency criteria. Whenever an independent evaluation is at public expense, the criteria under which the evaluation is obtained, including the location of the evaluation and the qualifications of the examiner, must be the same as the criteria which the public agency uses when it initiates an evaluation.
> 34 C.F.R. § 300.503.

8. The IDE's conforming procedures are nearly a verbatim copy of the federal regulations found in 34 C.F.R. § 300.503. The Iowa regulations provide:

> **41.109(1)** *Definitions.* As used in this rule:
> *"Independent educational evaluation"* means an evaluation conducted by a qualified examiner who is not employed by the agency responsible for the education of the individual in question.
> *"Public expense"* means that the agency either pays of the full cost of the evaluation or ensures that the evaluation is otherwise provided at no cost to the parent.
> **41.109(2)** *General.* A parent has the right to an independent educational evaluation at pub-

precluding reimbursement, and no assertion that reimbursement to the parents should not be forthcoming on that ground. However, the parties dispute whether there was another prerequisite to obtaining the evaluation at public expense.

### 2. Notice to the district

█ The first question the court must answer is whether parents can initiate an independent educational evaluation before notifying a school district that they disagree with the district's evaluation. Courts to consider this question have answered in the negative. *Board of Educ. of Murphysboro,* 41 F.3d at 1169; *Hudson,* 828 F.2d at 1065. As the Fourth Circuit explained in *Hudson:*

> [The school district] interprets § 300.503(b) to require a parent who obtains private testing to notify the school that it disagrees with its evaluation and give the school an opportunity "to show that its evaluation is appropriate" before

lic expense if the parent disagrees with an evaluation obtained by the agency. However, the agency may initiate a hearing under division XI to show that its evaluation is appropriate. If the final decision is that the evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at public expense.
> **41.109(3)** *Locations of independent educational evaluations.* Each agency shall provide to parents, on request, information about where an independent educational evaluation may be obtained.
> **41.109(4)** *Parent-initiated evaluations.* If the parent obtains an independent educational evaluation at private expense, the results of the evaluation must be considered by the agency in any decision made with respect to the provision of FAPE to the individual, and may be presented as evidence at a hearing.
> **41.109(5)** *Administrative law judge.* If an administrative law judge requests an independent educational evaluation as part of a hearing, the cost of the evaluation shall be at public expense.
> **41.109(6)** *Agency criteria.* Whenever an independent educational evaluation is at public expense, the criteria under which the evaluation is obtained, including the location of the evaluation and the qualifications of the examiner, must be the same as the criteria which the agency uses when it initiates an evaluation. These criteria shall be set forth in the AEA board policy.
> 281 Iowa Admin.Code R. 41.109

the parent obtains the private testing. This strained reading of the regulation obviously would leave the parent with no way to challenge a school's evaluation with a reimbursed private evaluation. The plain thrust of the regulation is that the school can later challenge the private testing, and, if it then convinces the administrative reviewers and the district court that its initial evaluation was correct, the parent will not be reimbursed.

*Hudson*, 828 F.2d at 1065. This court will not adopt such a strained reading either, and therefore concludes that the failure of the Plaintiffs here to notify the School District prior to obtaining an independent educational evaluation of Joseph is not fatal to their claim that the IDE erred when it determined that the School District was not required to pay the costs of that evaluation covered by the Plaintiffs' insurance.

### 3. "Public expense"

The more difficult question is, what is meant by "at public expense" in the regulations governing independent educational evaluations, which implement provisions of a statute designed to provide for the "free appropriate public education" of disabled children? The Defendants assert that the administrative law judge properly held that the statute and regulations are satisfied if the School District is required only to pay that part of the costs of Joseph's independent educational evaluation not covered by his parents' insurance. The court must first determine how much deference to give the agency's interpretation.

#### a. *Deference to agency interpretations*

The degree of deference to be given the agency's interpretation depends upon what kind of rule or regulation states the interpretation. Courts must generally give substantial deference to an agency's interpretation of its own regulations. *Thomas Jefferson Univ. v. Shalala*, — U.S. —, —,

114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994). Provided the agency's interpretation "does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Stinson v. United States*, 508 U.S. 36, —, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 150, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991) ("in situations in which the meaning of regulatory language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable") (quotations and citations omitted); *Shalala v. St. Paul–Ramsey Medical Ctr.*, 50 F.3d 522, 529 ((8th Cir.1995) ("the 'plainly erroneous' standards should be applied to the agency's interpretation where the meaning of the agency rule or regulation is ambiguous or in doubt"). Thus, a court may not substitute its construction of a regulation for that of the agency even when it determines another interpretation is more reasonable. *See Miller v. United States*, 65 F.3d 687, 689 (8th Cir. 1995). This deferential standard is afforded "legislative rules," which are interpretations of regulations that have been subjected to "notice-and-comment" procedures [9] prior to their general adoption and publication. *Shalala v. Guernsey Memorial Hosp.*, — U.S. —, —, 115 S.Ct. 1232, 1239, 131 L.Ed.2d 106 (1995); *St. Paul–Ramsey Medical Ctr.*, 50 F.3d at 527 n. 4.

However, "interpretive rules" by an agency are afforded less deference. "Interpretive rules" have not been subjected to "notice-and-comment," but instead have been "'"issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers."'" *Guernsey Memorial. Hosp.*, — U.S. at —, 115 S.Ct. at 1239 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705,

9. The "notice-and-comment" procedures referred to are those found in the Administrative Procedures Act, 5 U.S.C. § 553. *Guernsey Memorial Hosp.*, — U.S. at —, 115 S.Ct. at 1234; *United States v. Garfinkel*, 29 F.3d 451, 458 (8th Cir.1994). "The APA mandates not only that the agency make written findings describing the regulation's basis and purpose, 5 U.S.C. § 553(c), but it also mandates publication of and comment upon the proposed rule, *id.* § 553(b)(3), (c)," prior to the adoption of the agency's interpretation. *Garfinkel*, 29 F.3d at 458.

1718 n. 31, 60 L.Ed.2d 208 (1979), in turn quoting the Attorney General's Manual on the Administrative Procedure Act 30 n. 3 (1947)). Such "interpretive rules" do not have the force and effect of law and "are not accorded that weight in the adjudicatory process." *Guernsey Memorial Hosp.*, —— U.S. at ——, 115 S.Ct. at 1239; *St. Paul–Ramsey Medical Ctr.*, 50 F.3d at 527 n. 4; *Doe v. Reivitz*, 830 F.2d 1441, 1447 (7th Cir.1987). Although the courts may find such interpretations persuasive and treat them as if they were binding, the courts have the discretion to substitute their own judgment on all questions of statutory interpretation. *See St. Paul–Ramsey Medical Ctr.*, 50 F.3d at 527 n. 4 (citing *Guernsey*, —— U.S. at ——, 115 S.Ct. at 1238); *Reivitz*, 830 F.2d at 1447 (citing 2 K. Davis, *Administrative Law Treatise* § 7.11, at 55 (1979)). The preliminary power of interpretation is in the agency, but the final power of interpretation is in the courts. *Id.* Of course, the interpretation of a statutory term by an agency charged with administering the statute " 'do[es] constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)). However, the weight given to an agency interpretation in an "interpretive rule" depends on many factors, including the validity of its reasoning, its consistency with earlier and later agency pronouncements, and whether the administrative document was issued contemporaneously with the passage of the statute being interpreted. *Id.; accord Morton v. Ruiz*, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *Skidmore*, 323 U.S. at 140, 65 S.Ct. at 164. The Defendants base their constructions of the statute and regulations as allowing the Plaintiffs' insurer rather than the Defendant School District to bear the costs of Joseph's independent educational evaluation on both "legislative" and "interpretive" rules, and the court will give the proffered rules the appropriate degree of deference in its analysis.

### b. The agency's interpretations

There is scant legal authority on the issue before the court as to whether Joseph's parents are required to utilize the proceeds of private health insurance to pay for the independent educational evaluation. It is, of course, undisputed that the IDEA requires the furnishing of a free appropriate public education to disabled children such as Joseph. *See* 20 U.S.C. § 1400(c); 20 U.S.C. § 1412(2)(B); *Carter*, 510 U.S. at ——, 114 S.Ct. at 365; *Rowley*, 458 U.S. at 200, 102 S.Ct. at 3047; *Dell*, 32 F.3d at 1055. With respect to independent educational evaluations, the United States Department of Education has promulgated a regulation regarding "public expense" which provides:

> (ii) "Public expense" means that the public agency either pays for the full cost of the evaluation or ensures that the evaluation is otherwise provided at no cost to the parent, consistent with § 300.301.

34 C.F.R. § 300.503(a)(3)(ii). This regulation in turn makes specific reference to another regulation, found at 34 C.F.R. § 300.301, which provides:

> (a) Each State may use whatever State, local, Federal, and private sources of support are available in the State to meet the requirements of this part. For example, when it is necessary to place a child with a disability in a residential facility, a State could use joint agreements between the agencies involved for sharing the cost of that placement.
>
> (b) Nothing in this part relieves an insurer or similar third party from an otherwise valid obligation to provide or to pay for services provided to a child with a disability.

34 C.F.R. § 300.301. The court must give substantial deference to these legislative rules, *see Thomas Jefferson Univ.*, —— U.S. at ——, 114 S.Ct. at 2386, because both were promulgated after appropriate "notice-and-comment" procedures. *Guernsey Mem. Hosp.*, —— U.S. at ——, 115 S.Ct. at 1239; *St. Paul–Ramsey Med. Ctr.*, 50 F.3d at 527 n. 4. The court finds that a definition of "at public expense" that includes "private sources of support" serves the purpose of providing students who have special education needs with "a free appropriate public education." 20 U.S.C. § 1400(c). Thus, the

court concludes that this agency interpretation is in keeping with the goal of the IDEA of providing "a free appropriate public education." 20 U.S.C. § 1400(c). Therefore, this interpretation "does not violate the Constitution or a federal statute," nor "is it plainly erroneous or inconsistent with the regulation," and therefore will "be given controlling weight." *Stinson,* 508 U.S. at 45, 113 S.Ct. at 1919; *Thomas Jefferson Univ.,* —— U.S. at ——, 114 S.Ct. at 2386 (agency's proper interpretation is given substantial deference).

It is this latter regulation, which has been aptly described by one district court as "rather cryptic", *Seals v. Loftis,* 614 F.Supp. 302, 305 (E.D.Tenn.1985), upon which Defendants solely rely in support of their motions for summary judgment. Defendants contend that this regulation does not require Defendants to reimburse Plaintiff's private insurer for the costs associated with Joseph's independent educational evaluation. The court, however, concludes that such a holding would run counter to both the sparse case law on the subject, as well as the agency's own interpretation of its regulations.

In December of 1980, the United States Secretary of Education issued a Notice of Interpretation on Use of Parent's Insurance Proceeds in which the agency concluded that:

> The Secretary interprets the requirements that a free appropriate public education be provided "without charge" or "without cost" to mean that *an agency may not compel parents to file an insurance claim when filing the claim would pose a realistic threat that the parents of handicapped children would suffer a financial loss not incurred by similarly situated parents of non-handicapped children.* Financial losses include, but are not limited to, the following:
>
> (1) *A decrease in available lifetime coverage or any other benefit under an insurance policy;*
>
> (2) An increase in premiums or the discontinuation of the policy; or
>
> (3) *An out-of-pocket expense such as the payment of a deductible amount incurred in filing a claim.*
>
> Financial losses do not include incidental costs such as the time needed to file an insurance claim or the postage needed to mail the claim. The statutory and regulatory provisions relating to a free appropriate public education guarantee freedom only from financial loss as described above.
>
> Therefore, when the educational agency pays the financial costs related to filing a claim and no other cost (such as those listed above) is imposed, the parent suffers no financial loss. In addition, *an agency may insist that parents file a claim when they would incur only minor incidental costs such as the time required to complete the form. The agency may require the parents to file a claim if it ensures that parents do not have to bear even a short-term financial loss. For example, if benefits begin only after a $50.00 deductible, the agency may insist that the parents file a claim if it pays for the services and the deductible in advance.*

45 Fed.Reg. 86,390 (Dec. 30, 1980) (emphasis added). This regulation is due the deference of a substantive force-of-law rule because it was promulgated through notice-and-comment rule-making such as is found in section 553 of the Administrative Procedure Act, 5 U.S.C. § 553. *See, e.g., Guernsey Mem. Hosp.,* —— U.S. at ——, 115 S.Ct. at 1239; *United States v. Markgraf,* 736 F.2d 1179, 1184 (7th Cir.1984) ("Deference is more appropriate where the agency has actively interpreted the statute through rule making.") (citation omitted), *cert. dismissed,* 469 U.S. 1199, 105 S.Ct. 1154, 84 L.Ed.2d 308 (1985). Because the interpretation specifically preserves parents of disabled children from a financial loss incurred as the result of obtaining an independent educational evaluation, the court concludes that this agency interpretation is also in keeping with the goal of the IDEA of providing "a free appropriate public education." 20 U.S.C. § 1400(c). Therefore, this interpretation "does not violate the Constitution or a federal statute," nor "is it plainly erroneous or inconsistent with the regulation," and therefore will "be given controlling weight." *Stinson,* 508 U.S. at ——, 113 S.Ct. at 1919.

The clear import of this Notice of Interpretation is that the parents of a disabled child may not be required to look to their

private insurance for coverage where to do so would result in a financial loss not incurred by similarly situated parents of a non-disabled child. The first example of such a financial loss is precisely that which is before the court here. Joseph's health insurance policy carries a one million dollar cap on payments. If Defendants were not to reimburse Plaintiffs' insurer for the costs of Joseph's evaluation, Joseph's parents would suffer a financial loss within the meaning of the United States Secretary of Education's Notice of Interpretation on Use of Parent's Insurance Proceeds, 45 Fed.Reg. 86,390, because the effect of Defendants' actions would be to decrease the available lifetime coverage to Joseph under the insurance policy. 45 Fed.Reg. 86,390 (numbered item 1, defining "financial losses").[10]

Following the publication of the United States Secretary of Education's Notice of Interpretation on Use of Parent's Insurance Proceeds, the only court to address the question concluded that the parents of a disabled child were entitled to reimbursement for payments made by their insurance carrier for the evaluation of their child where such payment by the insurer reduced the lifetime benefits available under their policy. *Seals,* 614 F.Supp. at 305–06. In *Seals,* the parents of a disabled child obtained a medical evaluation of their son upon the recommendation of officials of the school district. *Id.* at 303. After taking their son to a physician recommended by the school district officials, that physician referred the child to other specialists for psychological and neurological evaluations. *Id.* The plaintiffs' insurance carrier paid for each of these evaluations. The plaintiffs' insurance policy carried a lifetime maximum for psychological services, but not for medical coverage. *Id.* The plaintiffs brought suit under the IDEA when a dispute arose over whether the plaintiffs or the school district were required to pay for the evaluations. In *Seals,* the court concluded that:

Because of [IDEA]'s emphasis upon a free appropriate public education, this Court concludes that parents of a handicapped child cannot be required to utilize their private medical insurance benefits where the utilization of those benefits would cause them to incur a financial cost. See Interpretation of 34 C.F.R. § 104 and 300 at 45 Fed.Reg. 86,390 (1980). Any other conclusion would be inconsistent with the concept of a free appropriate public education which underlies the [IDEA].

*Id.* From this the court went on to hold that because the plaintiffs had incurred a cost with respect to the insurance payment for the psychological examination, in that the payment reduced the lifetime benefits available to them under their insurance policy, the defendants were required to reimburse the plaintiffs. *Id.* at 306.[11] Thus, in *Seals,* the crucial and defining factor the court looked to was whether the insurance payment in question resulted in a reduction of lifetime insurance benefits. *See Seals* at 306. Here, because Joseph has suffered a reduction in lifetime benefits, under the *Seals* decision, as well as the Secretary of Education's Notice of Interpretation, Plaintiffs have suffered a financial loss that the School District must reimburse.

Defendants attempt to distinguish the *Seals* decision and the Secretary of Education's Notice of Interpretation on the ground that Plaintiffs voluntarily submitted the insurance claim for Joseph without being pressured by the state. This explanation, however, misdirects the proper focus of the inquiry, as both the *Seals* decision and the Secretary of Education's Notice of Interpretation make clear. The proper focus of the inquiry under the IDEA is on whether the parents of a disabled child incur a financial loss as the result of application of insurance benefits to payment for the independent educational evaluation, not whether the Defendants "pressured" them to look first to their

---

10. The Plaintiffs also suffered a financial loss of the third kind, out-of-pocket expenses including payment of a deductible, but the parties do not dispute that part of the administrative law judge's determination that the Defendant School District should reimburse that loss.

11. The court further concluded that because the plaintiffs' insurance payment to the neurologist had not resulted in the reduction of lifetime insurance benefits, defendants were not required to reimburse the plaintiffs for that portion of the insurance benefits paid. *Seals* at 306.

insurance carrier. *See id.* at 306; 45 Fed. Reg. 86,390 (Dec. 30, 1980).[12] Here, if not reimbursed for the cost of Joseph's evaluation, Plaintiffs will incur a financial loss in the form of reduced lifetime benefits available under their health insurance policy. *See Seals,* 614 F.Supp. at 305–06.

Defendants also point to various letter opinions, as well as the administrative law judge's supplemental order, as demonstrating that where the possible loss is somehow "speculative," the court should find that no financial loss has occurred. In particular, Defendants direct the court's attention to the letter opinion found in *Inquiry of Spann,* 20 IDELR 627 (Sept. 10, 1993 Office of Special Educ. Programs). However, the *Spann* letter ruling, which was the United States Department of Education's response to the question, "Is it appropriate for a school district to bill for third party insurance?", answers that question by quoting both 34 C.F.R. § 300.301, and the Secretary of Education's Notice of Interpretation. *Id.* at 628. The letter concludes with the following restatement of these interpretations:

> Therefore, public agencies may access parents' insurance to pay for required special education and related services in circumstances where the parents would incur *no realistic threat of a financial loss.* However, in circumstances where parents would incur *a realistic threat of a financial loss,* use of parents' insurance proceeds must be voluntary.

*Id.* (emphasis added).

The court notes, first, that an interpretation in a letter ruling, in contrast to legislative rules, is at best an "interpretive rule" that has not been subjected to notice-and-comment requirements, and therefore is not controlling on the courts. *See St. Paul-Ramsey Medical Ctr.,* 50 F.3d at 527 n. 4; *Reivitz,* 830 F.2d at 1447. Thus, the weight

given to the agency interpretation in such a ruling depends on such varied factors as the validity of its reasoning, its consistency with earlier and later agency pronouncements, and whether the administrative document was issued contemporaneously with the passage of the statute being interpreted. *Id.; Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *Skidmore,* 323 U.S. at 140, 65 S.Ct. at 164. To the extent the letter ruling states an interpretation different from that in the Secretary of Education's Notice of Interpretation, the court concludes that the *Spann* letter opinion shall be accorded little weight. The *Spann* letter opinion was not issued contemporaneously with the passage of the IDEA, and offers no independent reasoning.

However, the court simply cannot read *Spann* as stating an interpretation different from that found in the Secretary of Education's Notice of Interpretation. *Spann* merely recites the "no realistic threat of a financial loss" standard already found in the "legislative" rule stated in the Notice of Interpretation. The situation here, as this court has already concluded, falls precisely within the first example of such a realistic threat of financial loss, reduction in available lifetime coverage, identified in the Notice of Interpretation. *Spann* instructs the person asking for the ruling that these are the applicable standards, and, under *Spann,* this case therefore also involves a "realistic threat of a financial loss."

#### c. The administrative decision in light of agency interpretations

Assuming without deciding that "speculative" financial loss would not need to be reimbursed by the School District, the court concludes that there has been no such merely "speculative" loss on the record presented here. Although the administrative law judge's supplemental order seems to suggest

---

**12.** Situations are legion in which a person might voluntarily look to their own insurance carrier to pay benefits immediately, even though they believe another is ultimately responsible for paying for their loss. A ready example is the case in which a person who is injured or suffers a property loss in an automobile accident looks first to his or her own insurance company to be sure that replacement property can be obtained or medical expenses can be paid immediately, even though another person or that other person's insurer may ultimately be responsible for all losses. No one would suggest that the first person has waived any claim to recover from the other person simply because they submitted their claim, in the first instance, to the insurer they knew would pay in the emergency, leaving it until after the dust settled to sort out liability.

that the Plaintiffs' financial loss here is only "speculative," the reasons for such a conclusion are unsound. The administrative law judge acknowledged that the Plaintiffs' maximum insurance had a lifetime limit, and that the amount available had been reduced by the amount of the claim paid for the independent educational evaluation. Admin.Doc. SE–117., Supplemental Order of March 3, 1995, p. 2 n. 1. The administrative law judge's ruling continued as follows:

> In one sense this might be construed to be a "cost" to the parents since the account of funds remaining for Joseph's use has been reduced. For the purpose of this decision, however, the future need and use of this account is speculative and reliance on probabilities or possibilities for future need or use is inherently unreliable. Therefore, this decision addresses the cost of the January 1994 evaluation exclusively.

*Id.* The administrative law judge therefore awarded only the "costs" not paid by the Plaintiff's insurance. *Id.* at 3.

This court can only conclude that the administrative law judge's decision was erroneous. First, the administrative law judge's conclusion is contrary to the governing interpretation of the School District's obligation to pay where there is a threat of financial loss stated in the Secretary of Education's Notice of Interpretation. 45 Fed.Reg. 86,-390. Because that Notice of Interpretation defines a "financial loss" that must be prevented or reimbursed as "a decrease in lifetime coverage" under an insurance policy, and the administrative law judge's decision does not state any reason for departing from that interpretation in a case in which "a decrease in lifetime coverage" in fact occurred, nor cite the Notice of Interpretation to distinguish it, the court concludes that the administrative law judge's interpretation was the result of an oversight, not a reasoned departure from the governing interpretation. Second, the loss here is not "speculative," although whether the Plaintiffs will ever require the full limits of their coverage for Joseph might well be "speculative." There is no speculation involved in a conclusion that

the Plaintiffs no longer have available to them the same degree of coverage they had before their insurance paid for an independent educational evaluation. Thus, they have suffered a non-speculative financial loss, because they are still paying the same amount for lessened coverage. Finally, the language of the Notice of Interpretation does not preclude "speculative" losses, because it is cast, not in absolute terms of a "demonstrable" or "provable" loss, but in terms of a "realistic *threat*" of a loss. 45 Fed.Reg. 86,390. A "threat" is obviously a speculative or possible harm short of an actual harm.[13]

In the context of administrative hearings under the IDEA, where parents of children with special education needs are often not represented by legal counsel, considerations of consistency and simplicity in application weigh in favor of the interpretation stated in the Notice of Interpretation. 45 Fed.Reg. 86,390. When the applicable standard for establishing a financial loss is any decrease in available lifetime insurance coverage, the reviewing agency or court can quickly and simply determine whether the plaintiffs have suffered such a financial loss. Thus, standard defined as "any decrease in available lifetime insurance coverage" has the advantage of black letter law simplicity of statement and ease of application.

The "speculative" loss standard, articulated by the administrative law judge as requiring proof that the entire available insurance coverage will be used, on the other hand, would inevitably lead to a major round of expensive and protracted litigation dominated by opposing experts opining on the cost and duration of care and expenses for the disabled child. Much like major tort litigation in which a plaintiff has a substantial permanent injury, this court easily envisions opposing expert testimony from highly specialized (and expensive) physicians, rehabilitation experts, life care planners, and economists. Such administrative proceedings would enervate the purpose of the IDEA and the notion of a "free appropriate public education." Nothing suggests to the court that such a result was envisioned in the IDEA's

---

**13.** Webster's Ninth New Collegiate Dictionary defines "threat," *inter alia,* as "an indication of something impending." Webster's Ninth New Collegiate Dictionary 1229 (1991).

purpose of providing a "free appropriate public education" at public expense. *See Carter,* —— U.S. at ——, 114 S.Ct. at 365 (indicating that the purpose of the IDEA is "to ensure that children with disabilities receive an education that is both appropriate and free."); *School Comm. of Burlington,* 471 U.S. at 368, 105 S.Ct. at 2001–02 (noting that the principal purpose of the IDEA is to provide handicapped children with "a free appropriate public education which emphasizes special education and related services designed to meet their unique needs.").

Thus, the court concludes that, in keeping with the IDEA's emphasis upon a free appropriate public education, Plaintiffs must be reimbursed for payments made by their insurance carrier for the evaluation of Joseph, because such payment by Plaintiffs' insurer will reduce the lifetime benefits available under Joseph's health insurance policy. Therefore, the court will grant Plaintiffs motion for summary judgment and deny Defendants' respective motions for summary judgment.

### C. Appropriate Relief

Upon review, "basing its decision on the preponderance of the evidence, [the court] shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Thus, the final question the court must address is what relief the court finds is appropriate here. Because the Supreme Court has held that reimbursement is an appropriate remedy under the IDEA's predecessor, *School Comm. of Burlington,* 471 U.S. at 370–71, 105 S.Ct. at 2003, the court finds that reimbursement to Plaintiffs is a viable remedy in this case. Thus, contrary to the conclusion reached in the administrative proceedings, the court concludes that the Defendants shall reimburse the Plaintiffs for that part of the costs of the independent educational evaluation paid for by Plaintiffs' insurance, as well as that part

paid by the Plaintiffs personally. The court finds from the record that the part of the costs of the independent educational evaluation paid by Plaintiffs' insurance was $6,559.25 (total cost of $7,284.65 minus costs of $725.40 paid by Plaintiffs).[14] Furthermore, the Plaintiffs have represented to the court that the $3,500.00 received in settlement with the AEA was paid over to Plaintiffs' insurer. Thus, the unreimbursed amount paid by the Plaintiffs' insurer is $3,059.25. Judgment will therefore be entered in favor of Plaintiffs and against Defendants in the amount of $3,059.25, as well as attorneys fees and costs pursuant to statute.[15]

Plaintiffs indicated at the hearing that they had no objection to the court's ordering them to repay Joseph's insurance provider out of any judgment in their favor for the costs paid by the provider for Joseph's educational analysis. The court has broad discretion to grant appropriate relief. 20 U.S.C. § 1415(e)(2); *see generally School Comm. of Burlington,* 471 U.S. at 369, 105 S.Ct. at 2002. The court concludes that the appropriate relief in this instance also requires the court to order that Plaintiffs repay their insurer for the unreimbursed costs of Joseph's educational evaluation. Such a requirement places the parties back in the position they would have occupied if Plaintiffs had first sought and obtained payment from Defendants for Joseph's educational analysis. To hold otherwise could result in a financial windfall to the plaintiffs who elected the path of submitting the claim to their insurance company first, then seeking reimbursement from the school district.

The judgment in favor of Plaintiffs with a further order that Plaintiffs reimburse their insurance carrier in the amount of that judgment places the parties in the same position

14. Although various contradictory and confusing itemizations and totallings of the cost of the independent educational evaluation appear in the record, the cost of $7,284.65 for the evaluation is based on the State of Iowa's Response to Plaintiffs' Request for Admissions, ¶ 11.

15. Because Raymond S. and Janet S. are represented by the Legal Services Corporation of Iowa, and presumably have no fee agreement (other than perhaps for the recovery of statutory attorney fees under the IDEA), and also because the parties have not raised the question, the court need not determine whether Plaintiffs' counsel are entitled to fees out of the $3,059.25 for collecting this amount for the insurance company.

they would have occupied had Defendants paid for Joseph's educational evaluation in the first instance. Therefore, the court shall order Plaintiffs to reimburse Joseph's insurance carrier $3,059.25, from the judgment in Plaintiffs' favor in this lawsuit.

## V. CONCLUSION

According agency interpretations of the statute and regulations concerning who bears the costs of an independent educational evaluation the deference they are due, and finding the administrative law judge's conclusions plainly contrary to those agency interpretations, the court grants Plaintiffs' motion for summary judgment and denies Defendants' cross-motions for summary judgment. The court finds that the administrative law judge erred in holding that Defendants were required to reimburse Plaintiffs only for that part of the costs of the independent educational evaluation for Joseph not paid for by the Plaintiffs' insurance. Therefore, that part of the Supplemental Order of March 3, 1995, entered in Admin.Doc. SE–117 requiring Defendants to reimburse Plaintiffs only for that part of the costs of the independent educational evaluation for Joseph not paid for by Plaintiffs' insurance is **reversed.**

The court finds that the appropriate relief in this case, as shown by the preponderance of the evidence, is for the court to order Defendants to reimburse Plaintiffs for the full costs of the independent educational evaluation. Pursuant to the administrative proceedings, Defendants have already been ordered to pay part of those costs. That portion of the administrative law judge's decisions has gone unchallenged here, and is therefore undisturbed by the decision in this case. Furthermore, Plaintiffs obtained a settlement from one of the Defendants, which has been paid over to Plaintiffs insurance carrier as reimbursement for part of the costs paid by the insurer. Therefore **judgment shall be entered** in favor of Plaintiffs and against Defendants **in the amount of $3,059.25,** as well as attorneys fees and costs pursuant to statute. Finally, Plaintiffs are ordered to reimburse their insurance carrier

in the amount of $3,059.25 from this judgment for costs paid by the insurance carrier.

**IT IS SO ORDERED.**