34 F.3d 669
 45 Soc.Sec.Rep.Ser. 500, Medicare & Medicaid Guide
P 42,634
PORTLAND RESIDENCE, INC., Appellant,
Earl English, by Violet Berke, his mother and guardian;
Leonard Jankowski, Plaintiffs,
v.
Natalie STEFFEN, individually, Defendant,
Natalie Steffen, in her capacity as Commissioner of the
Minnesota Department of Human Services, Appellee.
 No. 93-3525.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 16, 1994.
Decided Sept. 8, 1994.
 
 Stephen B. Young, Minneapolis, MN, argued, for appellant.
 John L. Kirwin, St. Paul, MN, argued, for appellee.
 Before BOWMAN and LOKEN, Circuit Judges, and STEVENS,* District Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 This case arises under the Medicaid program. The plaintiffs filed an action in federal court seeking monetary damages from and declaratory relief against the Commissioner of the Minnesota Department of Human Services, claiming that federal law requires the state of Minnesota to guarantee a specific minimum level of payments to facilities that care for the mentally retarded. The District Court[1] granted summary judgment to the Commissioner. Plaintiff Portland Residence, Inc. appeals, and we affirm.
 
 I.
 A.
 
 2
 Medicaid (known in Minnesota as "Medical Assistance," or "MA") is a joint federal-state program that provides medical and other services to the poor. 42 U.S.C. Secs. 1396-1396u (1988 & Supp. IV 1992); Minn.Stat. Sec. 256B.01-.76 (1992 & Supp.1993). Although Minnesota's participation in Medicaid is voluntary, to receive the substantial federal money offered, Minnesota must comply with the Medicaid Act and all applicable federal regulations. Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 502, 110 S.Ct. 2510, 2513-14, 110 L.Ed.2d 455 (1990).
 
 
 3
 Medicaid requires participating states to offer many specific services. See, e.g., 42 U.S.C. Sec. 1396a(a)(10)(A) (1988 & Supp. IV 1992). Other services are optional. See id. Sec. 1396d(a). Minnesota's poor receive almost all of the optional services, including intermediate care facilities for the mentally retarded (ICFs/MR). Id. Sec. 1396d(a)(15) (1988); Minn.Stat. Sec. 256B.0625 subd. 2 (1992).
 
 
 4
 As required by the Medicaid Act, Minnesota has established a system for establishing payment rates for ICFs/MR. 42 U.S.C. Sec. 1396a(a)(13)(A) (Supp. IV 1992). This system is known as Rule 53. Minn.Rules pts. 9553.0010-.0080 (1993). Before Rule 53 went into effect in 1985, Minnesota ICFs/MR were reimbursed in accordance with the original Medicaid Act for "all reasonable costs" incurred during the preceding fiscal year, adjusted for inflation and projected cost increases. Minnesota's Medicaid costs swelled colossally under this reimbursement system--in just four years, from 1978 to 1982, ICFs/MR tripled their billings to the state.
 
 
 5
 To reduce Medicaid costs, as part of the Omnibus Reconciliation Act of 1980 Congress passed the Boren Amendment, the purpose of which was to allow states to develop more efficient payment systems without being smothered by federal oversight. Colorado Health Care Ass'n v. Colorado Dep't of Social Servs., 842 F.2d 1158, 1165 (10th Cir.1988). By its terms, the amendment applies to services rendered by hospitals, nursing facilities, and ICFs/MR. 42 U.S.C. Sec. 1396a(a)(13)(A). The Boren Amendment changed Medicaid reimbursement procedures so that, in place of the original Medicaid Act's "all-reasonable-costs" reimbursement standard, the affected facilities were to be paid sums "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards." Id.
 
 
 6
 Minnesota completed its implementation of the Boren Amendment in 1985, when Rule 53 took effect. Rule 53 uses a prospective rate-setting system: a facility's rates for each "rate year," which begins October 1, are based on the facility's allowable costs from its past "reporting year," which is the preceding calendar year, ending December 31. Minn.Rule pt. 9553.0020 subps. 38, 42. Because twenty-one months elapse between the mid-point of the reporting year and the mid-point of the rate year, the state adjusts the rate for inflation. Minn.Stat. Sec. 256B.501 subd. 3c (1992). As with the plans of all participating states, the Secretary of the United States Department of Health and Human Services (HHS), through the Health Care Financing Administration (HCFA), the federal agency within HHS that administers Medicaid, has approved Rule 53.
 
 
 7
 Rule 53's rates cover a facility's allowable costs if those costs do not increase faster than inflation. To the extent an ICF/MR's costs increase at a rate higher than the rate of inflation, it will not immediately receive increased reimbursement to cover this difference; instead, the facility will have to wait out the twenty-one month lag before its reimbursement rates are adjusted so as to reflect its past cost increases. Rule 53's predecessor, in contrast, allowed reimbursement rates to increase immediately along with increases in ICF/MR costs. Thus, Rule 53's prospective reimbursement system attempts to control costs by informing an ICF/MR in advance that it will receive a certain rate of reimbursement and that it must either keep its expenses in line with that rate or risk losing the sums it expends in excess of that rate.
 
 B.
 
 8
 Through various corporations, Leonard Jankowski owns numerous business, including several nursing homes and ICFs/MR. Portland Residence, Inc., an ICF/MR owned by Jankowski, has participated in Minnesota's MA program for many years. These two parties, along with Earl English, a mentally retarded Portland resident, were the plaintiffs in this suit.
 
 
 9
 Jankowski acquired Hampton Care Center, a nursing home that also participates in Minnesota's MA program, in 1990. Jankowski claims that Hampton was in serious financial straits when he acquired it, and that the facility lost between $600,000 and $700,000 during the first couple of years he owned it.
 
 
 10
 For some years, Portland has lent substantial sums of money to Jankowski and to his other businesses, including car rental and religious publishing companies. In April 1987 these loans totaled more than $200,000. By 1991, this figure nearly had tripled, to some $550,000 (plus a $20,000 loan that Portland wrote off). More than $300,000 of the $550,000 represents loans from Portland to Jankowski. The record is unclear as to how much Portland gave or lent Hampton.
 
 
 11
 Minnesota regularly advances funds to facilities such as Portland and Hampton for operating capital. In January 1992 Jankowski began claiming that, owing to Hampton's large losses, Portland's and Hampton's financial difficulties had become acute, and he asked the state to advance, against Hampton's pending MA billings, $60,000 to pay Portland's salaries. Jankowski presumably sought the advance against Hampton's billings, rather than Portland's, because he had assigned away Portland's receivables to an apparently unrelated company in exchange for a loan on which Portland was to pay from 20 to 36 percent interest.[2] The state refused to advance the sums requested by Jankowski.
 
 
 12
 In April 1992, Portland claimed that it was required to make numerous expenditures to be in compliance with state and federal licensing and certification requirements, and it requested the state to grant an immediate 47 percent increase in its allowable billing rate to allow it to make these expenditures. Citing Rule 53, the state denied the request. In May 1992, Jankowski requested advance payments of some $500,000. The state denied this request, too. However, on October 1, 1992, the state granted Portland a rate increase that exceeded 10 percent.[3]
 
 
 13
 The complaint in this lawsuit, which was filed in March 1992, sought both declaratory and monetary relief. It alleged that the state's rate-setting system violates the Boren Amendment, and that Portland's monetary losses meant that it had been subjected to a "taking" compensable under the Fifth Amendment.
 
 
 14
 The District Court recognized that the lawsuit basically sought monetary relief, and, finding no factual disputes, granted summary judgment to the state and dismissed the complaint. The District Court concluded that the claim for monetary relief was barred by the Eleventh Amendment and in any event lacked merit. The court also rejected the takings claim.
 
 
 15
 On appeal, Portland has abandoned its takings claim, and it now concedes that its claim for monetary relief is barred by the Eleventh Amendment. Instead, Portland magnifies and relies solely on its argument for prospective declaratory relief, claiming that the state has misconstrued, and its reimbursement system thereby violates, the Boren Amendment.
 
 II.
 
 16
 We review de novo a district court's grant of summary judgment. Pentel v. City of Mendota Heights, 13 F.3d 1261, 1263 (8th Cir.1994). Summary judgment for the moving party is appropriate if there is no genuine issue of material fact and the party is entitled as a matter of law to a judgment in its favor. Id. Thus, we review the record de novo to ensure that there is no genuine issue of material fact and that the District Court made no legal errors that would require reversal.
 
 
 17
 In this appeal, Portland asks us to hold that the Boren Amendment requires the Commissioner to articulate a specific minimum level of payments the state guarantees it will pay to operating ICFs/MR. Portland explains that these required costs are those necessary for it to provide quality care to and ensure the safety of its residents. For relief, Portland requests that we order Portland and the Commissioner to determine what minimum amounts the state must pay Portland, or, if the parties are unable to do so, that we direct the District Court to appoint a special master to determine such amounts.
 
 
 18
 Portland is careful to explain that its challenge to Rule 53 is quite narrow. It emphasizes that it seeks solely a holding that the Boren Amendment requires the state to guarantee payment of a certain level of expenditures. Portland even goes so far as to provide a detailed list of costs in its complaint, costs that the complaint states are necessary for Portland to comply with the Boren Amendment, but that on appeal Portland explains are merely hypothetical.[4]
 
 
 19
 To support its construction of the Boren Amendment, Portland argues that, because the state may determine in a later audit that certain expenses cannot be reimbursed, lenders cannot be certain that an ICF/MR will be entitled to reimbursement of its current expenditures, and therefore it is difficult for ICFs/MR to obtain financing. These difficulties in obtaining capital, Portland contends, threaten the viability of ICFs/MR such as Portland and their ability to provide quality care. Therefore, Portland concludes, the Boren Amendment must require states to establish a floor of costs that the state is obligated in all instances to pay. Portland also argues that Medicaid reimbursement rates must fall within a zone of reasonableness, and that in this case we should determine just where the lower boundary of that zone is.
 
 
 20
 We reject Portland's arguments. First and foremost, as Portland properly concedes, the statutory language provides no textual support at all for Portland's reading of the Boren Amendment as requiring a state to produce a specific list of expenses it will reimburse. Rather, the statutory language, in plain terms, requires only that a state establish a rate-setting system for ICFs/MR that is "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities," and that the state make findings in support of its rates and assure the Secretary that it has made such findings. Portland also concedes that no legislative history supports its reading of the Boren Amendment.
 
 
 21
 Although it appears that no court has discussed claims precisely like those advanced by Portland, an analogous proposition has been rejected. See Folden v. Washington State Dep't of Social and Health Servs., 981 F.2d 1054, 1057-58 (9th Cir.1992) (holding that the Boren Amendment does not require a state to establish a model facility against which to compare costs incurred by other facilities).
 
 
 22
 Plainly, the Boren Amendment permits states to use prospective systems, such as that used by Minnesota, as a means of containing costs. Wilder, 496 U.S. at 506-07, 110 S.Ct. at 2515-16. Indeed, most states have adopted such systems, id. at 507 n. 7, 110 S.Ct. at 2516 n. 7, and the Secretary has approved Minnesota's Rule 53. In view of Congress's intent to leave behind the costs-incurred reimbursement method and to contain Medicaid costs by allowing states to set up their own reimbursement systems with minimal federal oversight, it makes little sense to stretch the Boren Amendment's requirements to force states to produce a list of costs that will be reimbursed without fail. It was not an accident that Congress adopted minimal language requiring that states reimburse providers only for expenses the state considered "reasonable" and "adequate" for facilities that are "efficiently" and "economically" operated.
 
 
 23
 Our reading of the Boren Amendment as not requiring states to produce lists of allowable costs is bolstered by that of HCFA. When HCFA was promulgating rules to implement the Boren Amendment, it rejected a commentator's suggestion that states "furnish a list of those items and services that are mandated, and for which the proposed payment rates are found to be reasonable and adequate," explaining that current regulations were "adequate to assure that parties subject to reimbursement rates are made aware of items and services included in the rate." 48 Fed.Reg. 56046, 56049 (1983). Thus, HCFA has interpreted the Boren Amendment as not requiring states to produce the very list Portland requests. HCFA's determination is entitled to our deference. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). Even in the absence of this agency determination, however, as explained above, there simply is no textual or other support for Portland's construction of the Boren Amendment.
 
 
 24
 In any event, we have little doubt that Rule 53--which HCFA already has approved--both complies with the Boren Amendment and addresses the concerns expressed here by Portland. Rule 53 provides that costs incurred to meet licensing and certification requirements are allowable costs when reimbursement rates are calculated, Minn.Rules pt. 9553.0035 subp. 2 (1993), and, where a facility's rates are not adequate to allow it to meet applicable regulations, Rule 53 specifically provides for an upward rate adjustment, id. pt. 9553.0050 subp. 3.
 
 
 25
 Portland seems to argue through its repeated attacks on the state's authority to audit ICFs/MR that the state has established a rate-setting system that is retrospective or that in some way impermissibly leaves the state with too much discretion to approve or deny charges. First, it would be irrelevant to any issues before us if Rule 53 was a retrospective system, because the Boren Amendment permits states to choose either prospective or retrospective reimbursement systems. Wilder, 496 U.S. at 515, 110 S.Ct. at 2520. Second, the Boren Amendment authorizes--if it does not require--such audits. 42 U.S.C. Sec. 1396a(a)(13)(A) (Minnesota must "make[ ] further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each ... intermediate care facility for the mentally retarded and periodic audits by the State of such reports"). It plainly would be at odds with the Boren Amendment for Rule 53 to allow reimbursement to an ICF/MR for all charges the facility incurs, rather than just those charges that would be incurred by "efficiently and economically operated facilities." Portland has failed to demonstrate that the state's audit procedures violate any federal law or regulation.
 
 
 26
 Finally, we pause briefly to consider the state's rates. The Boren Amendment includes both procedural and substantive requirements. Procedurally, the state must make findings in support of its rate determinations and assure the Secretary that it has done so. Folden, 981 F.2d at 1057. Portland has not made any procedural challenges to Minnesota's reimbursement rates, so we need not consider this issue further.
 
 
 27
 Substantively, the Boren Amendment requires the state to provide funds "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." Although neither federal law nor HCFA defines these terms, HCFA has explained that "the State's methods and standards implicitly act as the State's definition of an efficiently and economically operated facility." 48 Fed.Reg. at 56049. Courts evaluating reimbursement rates have required only that the rates appear to be reasonable. See, e.g., Folden, 981 F.2d at 1058; Lett v. Magnant, 965 F.2d 251, 257 (7th Cir.1992). Rates are not substantively inadequate merely because they are insufficient to keep some facilities from losing money. Rather, to be substantively inadequate, the state's rates--which we presume valid--must be inadequate as to ICFs/MR in the aggregate. Lett, 965 F.2d at 257. Even assuming that, as Portland claims, its reimbursement rates are inadequate if the state does not give it the sums listed in note 4, supra, Portland has made no showing whatsoever that Minnesota's reimbursement system produces rates that are inadequate as to ICFs/MR in the aggregate. We therefore need not consider whether Portland's financial troubles were caused by the state's rates or by Portland's lending and giving substantial sums of its money to Portland's owner and his other businesses.
 
 
 28
 Portland's argument, that a "prospective system of minimum entitlement as called for by [Portland]'s construction of the Boren Amendment" will "encourage better quality treatment of residents" by making financing easier to obtain, Brief for Appellant at 24, is one that belongs in the political arena, not in the courts. Under our constitutional system of government and the statutory scheme here at issue, this court has no authority to require the state of Minnesota to establish such an entitlement.
 
 III.
 
 29
 For the reasons stated above, the judgment of the District Court is affirmed.
 
 
 
 *
 The HONORABLE JOSEPH E. STEVENS, JR., Chief Judge, United States District Court for the Western District of Missouri, sitting by designation
 
 
 [1]
 The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota
 
 
 [2]
 Although interest paid to obtain working capital is an allowable expense for rate-setting purposes, Minn.Rules pts. 9553.0035 subp. 9, 9553.0040 subp. 3R (1993), the record does not indicate whether the state considers it a reasonable and efficient business practice for Portland to lend away its capital at 9 percent interest, only to turn around and borrow from a third party at 20 to 36 percent interest
 
 
 [3]
 With this rate increase, Portland's reimbursement rate became $100.26 per resident per day. Thus, taxpayers must ante up $36,594.90 per year for each mentally retarded person Portland looks after. (Portland can accommodate 101 patients, for a total of $3,696,084.90 in taxpayer dollars per year.) Were Portland's reimbursement rate to be increased to $138.13 per resident per day, as Portland requests in its complaint, Portland would receive $50,417.45 per resident per year. In 1990 the average national ICF/MR patient reimbursement rate was $50,000 per year. Congressional Research Service, Medicaid Source Book: Background Data and Analysis 65 (1993). It appears that even with the Boren Amendment in place, we are looking at a program whose costs have run amuck
 
 
 [4]
 These costs are:
 Salary increases for staff and management $ 329,740
Working capital fund 250,000
New windows and heating and cooling system 200,000
Eight program instructors 187,081
Sprinkling system 100,000
Three secretaries 69,917
Personnel coordinator 30,139
New telephone system 30,000
Payables clerk 25,996
Carpeting 25,000
Computers (17), laser printers (2), scanner 24,149
Leased vans (4) 19,200
Part-time infection control specialist 16,574
Building equipment 14,695
Security system 6,800
Emergency generator 4,500
Tools and hardware 4,083
 ----------
total $1,337,875