**Susan BALDWIN, Plaintiff,**

v.

**IOWA SELECT FARMS, L.P., Defendant.**

**No. C 97–3038–MWB.**

United States District Court,
N.D. Iowa,
Central Division.

May 25, 1998.

Blake Parker of Blake Law Office, Fort Dodge, IA, for Plaintiff.

James H. Gilliam of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................ 833
  A. Factual Background ..................................................... 833
  B. Procedural Background ................................................. 834
II. LEGAL ANALYSIS ............................................................ 834
  A. Standards For Summary Judgment ................................. 834
  B. The FLSA's "Agriculture" Exemption ............................. 834
    1. The statutory framework ........................................... 835
    2. Interpretations ...................................................... 836
      a. Supreme Court precedent ...................................... 836
      b. Other courts ..................................................... 839
      c. Agency interpretations ......................................... 840
    3. Applicability of the exemption here .............................. 841
III. CONCLUSION ............................................................... 843

Discrete from the other issues in this lawsuit involving gender discrimination and pay claims is the question on which the defendant has moved for partial summary judgment: Was the defendant exempt from the overtime pay requirements of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq., because the plaintiff was an "employee employed in agriculture"? The defendant—a limited partnership that runs a confinement feeding pork production enterprise through various facilities—asserts that the plaintiff cannot seriously contend that her duties rais-

ing pigs fell outside of the broad definition of "agriculture" in 29 U.S.C. § 203(f). The plaintiff, however, counters that the specialization, segmentation, and "industrialization" of the defendant's hog operations makes the "farm worker" exemption of the FLSA a painful fit when, as plaintiff puts it, the defendant's operation is about as remote from being a "farm" as Ford Motor Company is.

## I.  INTRODUCTION

### A.  Factual Background

Although this matter is before the court on a motion for partial summary judgment, the parties do not assert that it is genuine issues of material fact that will be dispositive of the motion, but the court's legal interpretation of the scope of the "employed in agriculture" exemption to the FLSA's overtime pay requirements. *See* 29 U.S.C. §§ 213(b)(12) & 203(f). Therefore, the court may consider the present motion in the context of the following, essentially undisputed facts.

Plaintiff Susan Baldwin was employed by defendant Iowa Select Farms, L.P. (ISF), as a "Sow Farm Technician" at ISF's "Sow Site # 14" near Webster City, Iowa, from approximately July 5, 1995, until May 6, 1996. Although she states that she does not recall ever being given a job description, she concedes that the job description offered into the record by ISF accurately describes the work she performed for ISF, if it is limited to the handling of sows and the birthing of pigs. That job description is as follows:

**Job Title:** Sow Farm Technician
**Responsible to:** Department Manager
**Primary Responsibility:** Care and management of animals and facility to ensure overall productivity.
**Primary Duties:**
* Care and management of animals to ensure that:
  — Animals are fed properly
  — Water is available
  — Sick animals are properly treated
  — Condition is evaluated and maintained
* Care and management of facilities to ensure that:
  — Fans, curtains, heaters and other equipment are operating properly
  — Ventilation equipment is adjusted to provide proper environment
  — Facilities are kept clean, including power washing and disinfecting
* Maintaining accurate records
* Procuring, administering, and dispensing medications and vaccinations
* Hand mating and artificial insemination
* Heat detection and pregnancy check
* Monitoring and assisting in the farrowing process if necessary
* Processing/Castration of baby pigs
* Cross-fostering pigs
* Weaning pigs
* Creep feeding
* Animal movement
* Providing regular feedback to Department Manager
* All other duties assigned by supervisors
**Qualifications/Skills:**
* Ability to lift minimum of 40 pounds
* Ability to climb over 4 foot gate(s)
* Candidate must be:
  — A self-starter, highly motivated
  — Very well organized
  — Dependable
  — Detailed [sic] oriented
  — Team oriented
**Attendance/Punctuality:**
* Consistent attendance and punctuality necessary

Defendant's Statement of Undisputed Facts, (unnumbered exhibit, Bates # 0095). Baldwin was working on a "salary" for ISF. She asserts that during the time she worked for ISF, she was expected to work long hours, often in excess of forty hours per week, but she was never paid overtime. ISF concedes that Baldwin was not paid overtime for hours worked in excess of forty per week, but contends that she was exempt from overtime pay requirements. After what Baldwin describes as a particularly long week, she either quit or was fired from her job at Sow Farm # 14. However, the circumstances surrounding her termination are not at issue at this time.

Baldwin worked at only one of the kinds of facilities that make up ISF's confinement feeding hog production operation. ISF utilizes "three-site production" and "segregated early weaning" with the goal of disease prevention and management, which ISF considers critical to successful hog production. The first of the three sites is a breeding/gestation/farrowing farm ("sow farm"), like the one where Baldwin was employed. ISF owns or leases seventeen sow farms and is constructing four more. Pigs are weaned at the sow farms, and, at approximately sixteen days old, are moved away from the sow to

ensure high maternal immunities, but low exposure to any diseases carried by the sow. Pigs are moved to an "off-site" "nursery farm," which has been depopulated, cleaned, and disinfected prior to arrival of the pigs. Pigs stay at the nursery farm for approximately six to eight weeks, but then are moved again to another separate "finishing farm" that has also been depopulated, cleaned, and disinfected prior to arrival of the pigs. When the hogs have reached market weight at the finishing farm, they are transported to a processing plant, where ISF's involvement with them ends. This production method, ISF asserts, breaks the cycle of disease that would be difficult to stop at a single-site confinement operation without completely depopulating the farm, including removal of breeding stock.

ISF describes its operation as consisting of seventeen farrow-to-finish hog production farms, either owned or leased by ISF. ISF states that it employs 612 full-time and 74 part-time employees. Each "sow farm" employs between nine and fourteen employees, including a farm manager, two department heads, and a number of breeding and farrowing technicians, such as Baldwin. Each "nursery farm" typically has between two and four employees, including a farm manager. Each "finishing farm" typically has between one and three employees, including a farm manager. Groups of the various types of farms are supervised by a sow, nursery, or finishing farm supervisor. ISF also has crews of employees dedicated to specific functions, including hog loading, barn cleaning, transportation, and manure application, in support of its primary hog production operations.

ISF maintains, and Baldwin does not dispute, that its sole business is confinement feeding pork production and functions related to such pork production. Its major production functions are the breeding of sows and gilts through artificial insemination; the farrowing of sows and the weaning of pigs; the growing of pigs and hogs in nursery and finishing operations; and the marketing of hogs. In support of these production activities, ISF also purchases feed and other supplies; obtains veterinary services from in-house and local veterinarians; transports its weanling nursery pigs and market hogs between farms and to market in its own trucks and via common carrier; constructs new confinement operations; forward purchases or sells and hedges corn, soybean meal, and hogs; and applies manure from its farms to neighboring farmland with its own employees or through custom applications. However, ISF does not, for example, engage in meat processing, grain production or milling, or "finishing" of hogs for other producers.

## B. Procedural Background

Baldwin filed her lawsuit against ISF on April 21, 1997, alleging gender pay discrimination in violation of Title VII, the Equal Pay Act, and the Iowa Civil Rights Act. These claims are set forth in Counts I through III of Baldwin's complaint. Count IV of her complaint, however, is the only one at issue at this time. Count IV alleges that Baldwin is a non-exempt employee entitled to overtime wages under the FLSA, but that ISF has willfully failed to pay her that overtime for hours worked in excess of forty per week. On this count, Baldwin seeks unpaid wages and an equal amount in liquidated damages.

On March 2, 1998, ISF moved for partial summary judgment on Count IV of Baldwin's complaint. ISF contends in its motion that Baldwin was an employee employed in "agriculture," pursuant to 29 U.S.C. § 203(f), and therefore is not entitled to overtime pay. 29 U.S.C. § 213(b)(12). Baldwin resisted the motion for partial summary judgment on April 3, 1998. The court heard oral arguments on the motion on May 21, 1998. Plaintiff Susan Baldwin was represented by counsel Blake Parker of the Blake Parker Law Office in Fort Dodge, Iowa. Defendant Iowa Select Farms, L.P., was represented by counsel James H. Gilliam of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., in Des Moines, Iowa.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of recent decisions. *See, e.g.,*

*Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Center*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

> Rule 56. Summary Judgment
>
> (b) For Defending Party. A party against whom a claim … is asserted … may, at any time, move for summary judgment in the party's favor as to all or any part thereof.
>
> (c) Motions and Proceedings Thereon.… *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(b) & (c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394.

■ Furthermore, this court has concluded that statutory interpretation—particularly interpretation of the effect of a statute where facts are undisputed—is primarily a legal question amenable to summary judgment. *See Prudential Ins. Co. of Am. v. Rand & Reed Powers Partnership*, 972 F.Supp. 1194, 1202–03 (N.D.Iowa 1997), *aff'd*, 141 F.3d 834 (8th Cir.1998); *accord United States v. Carr*, 66 F.3d 981, 983 (8th Cir.1995) (statutory interpretation is a question of law reviewed *de novo* ); *United States v. Moore*, 38 F.3d 977, 979 (8th Cir.1994) (the task of statutory interpretation "is one best placed in the hands of the trial judge," because it is a question of law); *United States v. Brummels*, 15 F.3d 769, 771 (8th Cir.1994) (explaining that, while findings of fact are reviewed for clear error, "[a]s to application of facts to the legal interpretation of [a statute], the standard of review is *de novo* "). Thus, because the central issue before the court is essentially legal—statutory interpretation—summary disposition may be particularly appropriate.

With these standards in mind, the court turns to consideration of ISF's motion for partial summary judgment.

**B.  The FLSA's "Agriculture" Exemption**

*1.  The statutory framework*

■ The FSLA provides that "it shall be unlawful for any person" to violate the minimum wage, overtime, and recordkeeping provisions of the Act. 29 U.S.C. § 215(a)(2) & (5); *Reich v. Stewart*, 121 F.3d 400, 404 (8th Cir.1997). The FLSA generally requires that covered employees must be paid one-and-one-half times their regular hourly rate for hours worked in excess of forty per week. *See* 29 U.S.C. § 207(a)(1); *Christian v. City of Gladstone, Mo.*, 108 F.3d 929, 931 (8th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997); *Murray v. Stuckey's, Inc.*, 50 F.3d 564, 566 (8th Cir.), *cert. denied*, 516 U.S. 863, 116 S.Ct. 174, 133 L.Ed.2d 114 (1995); *Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1182 (8th Cir.1993). However,

there are several exemptions to the FLSA's overtime pay requirements set forth in 29 U.S.C. § 213(b), including the following:

> (b) The provisions of section 207 of this title shall not apply with respect to—
>
> \* \* \* \* \* \*
>
> (12) any employee employed in agriculture....

29 U.S.C. § 213(b)(12).[1] For the purposes of the FLSA, "agriculture" is defined in § 203(f) as follows:

> (f) *"Agriculture" includes farming in all its branches and among other things includes* the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), *the raising of livestock,* bees, fur-bearing animals, or poultry, *and any practices* (including any forestry or lumbering operations) *performed by a farmer or on a farm as incident to or in conjunction with such farming operations,* including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f) (emphasis added).

It is the scope of the "employed in agriculture" exemption in § 213(b)(12) and the companion definition of "agriculture" in § 203(f) that are presently at issue. In its motion for partial summary judgment on Baldwin's FLSA claim, ISF argues that hog production is clearly contemplated within the statutory meaning of "agriculture" and pertinent regulations, 29 C.F.R. § 780.120, and that nothing in the case law or in the nature of ISF's operations requires a contrary conclusion. Baldwin, however, contends that the "scientific" and "industrialized" process for raising hogs used by ISF is not within the contemplation of what she describes as the "farm worker" exemption to the FLSA's overtime pay requirements. More specifically, she argues that ISF cannot meet the definition of

being a farmer; that the Iowa Supreme Court has denied a comparable agricultural exemption in state laws to operations much like ISF; that Sow Site # 14 was a "separately organized" productivity unit, which breaks the continuity in livestock raising, and hence does not fall within the meaning of "agriculture" under Iowa or United States Supreme Court precedent; and that ISF's activities are neither performed by a farmer nor on a farm, but at an industrialized production facility that has no farm-like qualities. In reply, ISF asserts that Baldwin is blurring statutory definitions, attempting to require ISF to engage in functions not required by the FLSA, and relying on overruled state precedent, while ISF's activities actually fall within the primary meaning of agriculture under precedent of the United States Supreme Court. ISF contends that there was no break in ownership of the hogs, a flaw in some assertions of the agricultural exemption under the FLSA, because ISF raises hogs from insemination through finishing and delivery to market. ISF also argues that Baldwin was employed on a "farm," that is, a location where livestock is raised.

### 2. Interpretations

#### a. Supreme Court precedent

Many years ago, the United States Supreme Court explained that the exemption for agriculture "was meant to embrace the whole field of agriculture, and sponsors of the legislation so stated." *Maneja v. Waialua Agricultural Co.*, 349 U.S. 254, 260, 75 S.Ct. 719, 99 L.Ed. 1040 (1955) (citing 81 Cong. Rec. 7648, 7658). "Nevertheless, no matter how broad the exemption, it was meant to apply only to agriculture and we are left with the problem of what is and what is not properly included within that term." *Id.*

Most recently, the United States Supreme Court discussed what is and what is not within the definition of "agriculture" in the

---

1. Subsection 213(b)(12) was amended in 1997 by Pub.L. 105–78, § 105, but that amendment is not pertinent here: It was enacted after the period during which Baldwin claims she was improperly denied overtime pay, and, even if the amendment had been effective at the relevant time, it related to the exemption in the second clause of § 213(b)(12), the so-called "irrigation" exemption, not to the "employed in agriculture" exemption.

FLSA in *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996). *Holly Farms* was not in fact "a FLSA case," but instead involved a dispute over the classification of certain workers under the National Labor Relations Act (NLRA). *Holly Farms*, 517 U.S. at 394, 116 S.Ct. 1396. Nonetheless, as the Court explained, "annually since 1946, Congress has instructed, in riders to Appropriations Acts for the Board: '[A]gricultural laborer,' for NLRA § 2(3) purposes, shall derive its meaning from the definition of 'agriculture' supplied by § 3(f) [29 U.S.C. § 203(f) ] of the Fair Labor Standards Act of 1938 (FLSA)." *Id.* at 397, 116 S.Ct. 1396 (citing *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 300 & n. 6, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977)). Therefore, the Court turned to interpretation of the scope of the definition of "agriculture" in the FLSA.

After quoting the statutory definition in § 3(f) of the FLSA, 29 U.S.C. § 203(f), also quoted just above, the Court made these observations:

> This definition, we have explained, "includes farming in both a primary and a secondary sense." *Bayside*, 429 U.S., at 300, 97 S.Ct. 576. "Primary farming" includes the occupations listed first in § 3(f): "the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities... [and] the raising of livestock, bees, fur-bearing animals, or poultry." 29 U.S.C. § 203(f). "Secondary farming" has a broader meaning, encompassing, as stated in the second part of § 3(f): "any practices ... performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." *Ibid.;* see *Bayside*, 429 U.S., at 300, n. 7, 97 S.Ct. 576; *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 763, 69 S.Ct. 1274, 93 L.Ed. 1672 (1949) (secondary farming embraces "any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidently to or in conjunction with 'such' farming operations").

*Holly Farms*, 517 U.S. at 398, 116 S.Ct. 1396; *see also Farmers Reservoir & Irrigation Co.*, 337 U.S. at 763, 69 S.Ct. 1274 (first noting that "agriculture," as defined in the FLSA, "has two distinct branches," a "primary meaning" that "includes farming in all its branches," some of which were specifically listed in the statute, and a "[s]econd ... broader meaning" that embraced "things other than farming as so illustrated" to "include[ ] any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidently to or in conjunction with 'such' farming operations").

Thus, the Court's analysis in *Holly Farms* proceeded in two stages: First, the Court considered whether the employer was engaged in "primary" agriculture, *id.* at 399–400, 116 S.Ct. 1396; second, only because the answer to the first question was negative, the Court considered whether the employer was engaged in "secondary" agriculture. *Id.* at 400–04, 116 S.Ct. 1396. As to "secondary" agriculture, the Court considered whether the employees in question were engaged in activity "performed by a farmer," *id.* at 400, 116 S.Ct. 1396, and whether they were employed "on a farm" performing activities "as an incident to" or "conjoined with" a primary agriculture activity. *Id.* at 401–04, 116 S.Ct. 1396 (noting, at 402, 116 S.Ct. 1396, that "[t]he essential question" on this strand of the analysis "is whether the ... employees' activities are inevitably 'incident to or in conjunction with' the farming operations of the independent growers").

In *Holly Farms*, on the first strand of the analysis, the Court concluded that independent growers of broiler chickens under contract to Holly Farms were engaged in "primary" agriculture, but "live-haul" employees of Holly Farms, who caught chickens at the contract farms and delivered them to Holly Farms' processing plant, were not "themselves engaged in raising poultry." *Id.* at 400, 116 S.Ct. 1396. "Thus," the Court observed, "the only question we resolve is whether the chicken catchers, forklift operators, and truckdrivers are engaged in *secondary* agriculture—that is, practices 'performed

by a farmer or on a farm as an incident to or in conjunction with such farming operations.'" *Id.* (quoting 29 U.S.C. § 203(f), with emphasis in the original).

On the "performed by a farmer" strand of the "secondary" agriculture analysis, the Court revisited its prior decision in *Bayside Enterprises, Inc. v. NLRB,* 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977):

> [In *Bayside,* w]e upheld the Board's rejection of the contention that "all of the activity on a contract farm should be regarded as agricultural activity of an integrated farmer" such as Holly Farms. 429 U.S., at 302, 97 S.Ct. 576. When an integrated poultry producer "contracts with independent growers for the care and feeding of [its] chicks, [its] status as a farmer engaged in raising poultry ends with respect to those chicks." *Id.,* at 302, n. 9, 97 S.Ct. 576 (citing *Imco Poultry,* 202 N.L.R.B., at 260). Accordingly, when the live-haul employees arrive on the independent farms to collect broilers for carriage to slaughter and processing, Holly Farms does not resume its status as "farmer" with respect to those birds, the status Holly Farms had weeks before, when the birds were hatched in its hatcheries.

*Holly Farms,* 517 U.S. at 400, 116 S.Ct. 1396.

On the second strand of the "secondary" agriculture analysis, the Court found that the live-haul crews were not engaged in activity "on the farm" that was "incidental to or in conjunction with" farming operations, because those activities, while on the farm, were incidental to and in conjunction with Holly Farms' slaughtering and processing operations, and hence did not constitute "farming" under the statute. *Id.* at 401, 116 S.Ct. 1396. In so concluding, the Court found it "sensible" that the Board had "homed in on the status of the live-haul crews' *employer*" with respect to the particular activity at issue. *Id.* at 404, 116 S.Ct. 1396 (emphasis in the original). Thus, employees engaged in activities surrounding Holly Farms' egg-hatching and pullet-raising operations were engaged in poultry-raising operations, that is, they were aligned with activities of their employer that constituted "primary" agriculture. *Id.* Hence, they were

"agricultural laborers." *Id.* However, live-haul crews were aligned with slaughter and processing activities, that is, with activities of their employer when it was not engaged in "primary" agriculture. *Id.*

■ Some further points from the Court's earlier decisions bear some discussion. In *Maneja v. Waialua Agricultural Co.,* 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040 (1955), the Court noted that "[n]owhere in the Act was any attempt made to draw a distinction between large and small farms or between mechanized and nonmechanized agriculture. In fact, the very opposite appears, since Congress in 1949 specifically refused to draw a distinction between large and small farms similar to the distinctions drawn in the size of newspapers or telephone companies." *Maneja,* 349 U.S. at 261, 75 S.Ct. 719 (citing H.R.Rep. No. 267, 81st Cong., 1st Sess., p. 24, and comparing FLSA §§ 13(a)(8), 13(a)(11), and 13(a)(15), 29 U.S.C. § 213(a)(8), (11), and (13)). Most pertinent here, ISF asserts, is the conclusion of the Court in *Maneja* that, in light of the failure to make such distinctions,

> we cannot hold that merely because Waialua uses a method ordinarily not associated with agriculture—a railroad—to transport the [sugar] cane from the field to the mill, it has forfeited its agriculture exemption. *Where a farmer thus uses extraordinary methods, we must look to the function performed.* Certainly no one would argue that the agriculture exemption did not apply to farm laborers who took the cane to the plant in wheelbarrows. There is no reason to construe the FLSA so as to discourage modernization in performing this same function.

*Maneja,* 349 U.S. at 261, 75 S.Ct. 719 (emphasis added). Nor was a different result required, the Court held, simply because the sugar cane growers were transporting cane from their own fields to their own mill, because there was no sign of congressional intent to deny the exemptions covering "delivery to storage or to market or to carriers for transportation to market" to farmers who owned their own mills. *Id.* ISF particularly relies on this decision for validation of its

"extraordinary" method of hog production as "agriculture."

■ Oddly enough, it is in the earliest of the Supreme Court's decisions interpreting the definition of "agriculture" in the FLSA, *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672 (1949), that the Court had the most to say about how modern specialization affects the scope of "agriculture" as defined in the FLSA. *See* 29 C.F.R. § 780.104 (relying on *Farmers Reservoir & Irrigation Co.* for an explanation of "[t]he effect of modern specialization on agriculture"). The Court wrote,

> Whether a particular type of activity is agricultural depends, in large measure, upon the way in which that activity is organized in a particular society. The determination cannot be made in the abstract.... [F]unctions which are necessary to the total economic process of supplying an agricultural product become, in the process of economic development and specialization, separate and independent productive functions operated in conjunction with the agricultural function but no longer a part of it. *Thus, the question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farmers in other situations. The question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity.*

*Farmers Reservoir & Irrigation Co.*, 337 U.S. at 760–61, 69 S.Ct. 1274 (emphasis added). Baldwin seizes upon this language to assert that the various phases of hog production in ISF's scheme of operations are "separately organized" as "independent productive activity," and hence are not within the statutory definition of "agriculture."

#### b. Other courts

Various other courts have grappled with the scope of the definition of "agriculture" in the FLSA, but like the Supreme Court, they have most often come to grips with the question of whether certain activities fell within the "secondary" meaning, because those activities were not listed in the first clause of § 3(f) as activities specifically included within the "primary" definition. *See, e.g., NLRB v. Hudson Farms, Inc.*, 681 F.2d 1105, 1106 (8th Cir.) (holding that employees who transported live poultry from an independent grower's farm to their employer's processing plant were not "agricultural laborers," citing *Bayside*), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *Valmac Indus., Inc. v. NLRB*, 599 F.2d 246, 249 (8th Cir.1979) (concluding that employees who transported products away from the farm did not do work that was either "primary" or "secondary" farming); *see also Reich v. Tiller Helicopter Servs., Inc.*, 8 F.3d 1018, 1023–30 (5th Cir.1993) (examining the Supreme Court's interpretation of the agricultural exemption in *Farmers Reservoir* and *Maneja* and, although finding no dispute about when employees of both a farming operation and a crop dusting company were engaged in primary agriculture, considering whether certain activities of those employees in the crop dusting business fell within the secondary meaning of agriculture); *Coleman v. Sanderson Farms, Inc.*, 629 F.2d 1077, 1081 (5th Cir.1980) (live-haul drivers were within the secondary meaning of agriculture, performing work by a farmer as an incident to or in conjunction with their employer's primary farming task of raising poultry); *Marshall v. Gulf & Western Indus., Inc.*, 552 F.2d 124, 126 (5th Cir.1977) (the fact that tomatoes grown by independent farmers were processed by the employer prevented it from receiving the "secondary agriculture" exemption); *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, 411–12 (5th Cir.1975) (employees who delivered and disposed of dairy products did not fit within the primary or secondary meaning of agriculture); *Brennan v. Sugar Cane Growers Co-op. of Fla.*, 486 F.2d 1006, 1011 (5th Cir.1973) (camp cooks for sugar cane workers fell within the secondary meaning of agriculture); *Hodgson v. Ewing*, 451 F.2d 526 (5th Cir.1971) (clerical work performed for a contractor primarily engaged in leveling agricultural land was not within the secondary meaning of agriculture, as most of that clerical work took place off the farm).

Somewhat different is *Wirtz v. Tyson's Poultry, Inc.*, 355 F.2d 255 (8th Cir.1966), in which our own Circuit Court of Appeals held that a corporation engaged in the assembling, grading, handling, sizing, candling, packing, and shipping of eggs obtained from an affiliated corporation was within the agricultural exemption on wage and overtime compensation, because it carried on and headed up a single and completely integrated farming operation, and maintained the ownership of the eggs and egg-producing birds throughout the process. *Tyson's Poultry, Inc.*, 355 F.2d at 260. This decision at least suggests that where a company, such as ISF, maintains ownership and control over livestock from breeding through marketing, it is engaged in primary agriculture.

### c. Agency interpretations

■ The regulations promulgated by the Secretary of Labor to interpret the meaning of "agriculture" as defined in the FLSA are more helpful on what activities fall within the "primary" meaning of "agriculture" than the scant case law addressing the issue.[2] Applicable regulations indicate that the "primary" meaning of agriculture includes listed activities, and "[i]f an employee is employed in any of these activities, *he is engaged in agriculture regardless of whether he is employed by a farmer or on a farm.*" 29 C.F.R. § 780.105(b) (emphasis added).

Furthermore, pursuant to 29 C.F.R. § 780.106, persons engaged in activities listed as primary agriculture are included within the exemption, and the purpose of the employer in performing the activity or the place where it is performed are "immaterial." 29 C.F.R. § 780.106.

Turning to regulations specifically considering the listed primary agriculture activity of "raising livestock," *see Hearnsberger v. Gillespie*, 435 F.2d 926, 929 (8th Cir.1970) ("The only activity as to livestock listed within the 'primary' meaning of agriculture is 'the raising of livestock.' "), the regulations provide as follows:

> Employees are employed in the raising of livestock ... only if their operations relate to animals of the type named and constitute the "raising" of such animals. If these two requirements are met, it makes no difference for what purpose the animals are raised or where the operations are performed. For example, the fact that cattle are raised to obtain serum or virus or that chicks are hatched in a commercial hatchery does not affect the status of the operations under section 3(f).

29 C.F.R. § 780.119. "Livestock" in turn is defined in the regulations as follows:

> The meaning of the term "livestock" as used in section 3(f) is confined to the ordinary use of the word and includes only

---

**2.** As this court recently observed in *Raymond S. v. Ramirez*, 918 F.Supp. 1280 (N.D.Iowa 1996), the degree of deference to be given the agency's interpretation depends upon what kind of rule or regulation states the interpretation. *Raymond S.*, 918 F.Supp. at 1291–92; *see also Snap–Drape, Inc. v. Comm'r of Internal Revenue*, 98 F.3d 194, 197 (5th Cir.1996) ("[T]he standard of review depends on whether the regulation is legislative or interpretive."), *cert. denied,* —— U.S. ——, 118 S.Ct. 77, 139 L.Ed.2d 36 (1997). Agency interpretations of a statute the agency administers are to be given considerable deference. *See Connecticut Dep't of Income Maintenance v. Heckler*, 471 U.S. 524, 105 S.Ct. 2210, 85 L.Ed.2d 577 (1985) ("We have often noted that the interpretation of an agency charged with the administration of a statute is entitled to substantial deference," quoting *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982)); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("We have long recognized that considerable weight should be accorded to an execu-

tive department's construction of a statutory scheme it is, entrusted to administer, and the principle of deference to administrative interpretations"; footnote omitted); *Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977) (where Congress "expressly delegated to the [agency] the power to prescribe standards for determining what constitutes 'unemployment' for the purposes of [the AFDC–UF statute] ... Congress entrusts to the [agency], rather than to the courts, the primary responsibility for interpreting the statutory term. In exercising that responsibility, the [agency] adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner"; emphasis in the original); *Norton v. Railroad Retirement Bd.*, 69 F.3d 282, 283 (8th Cir. 1995); *Shalala v. St. Paul–Ramsey Medical Ctr.*, 50 F.3d 522, 527 (8th Cir.1995); *Portland Residence, Inc. v. Steffen*, 34 F.3d 669, 673 (8th Cir.1994); *Miernicki v. Railroad Retirement Bd.*, 20 F.3d 354, 356 (8th Cir.1994).

domestic animals ordinarily raised or used on farms ... The term includes the following animals, among others: Cattle (both dairy and beef cattle), sheep, *swine*, horses, mules, donkeys, and goats ....

29 C.F.R. § 780.120 (emphasis added). "Raising" of livestock is also defined in the regulations, as follows:

> The term "raising" employed with reference to livestock in section 3(f) includes such operations as the breeding, fattening, feeding, and general care of livestock. Thus, employees exclusively engaged in feeding and fattening livestock in stock pens where the livestock remains for a substantial period of time are engaged in the "raising" of livestock. The fact that the livestock is purchased to be fattened and is not bred on the premises does not characterize the fattening as something other than the "raising" of livestock. The feeding and care of livestock does not necessarily or under all circumstances constitute the "raising" of such livestock, however. It is clear, for example, that animals are not being "raised" in the pens of stockyards or the corrals of meat packing plants where they are confined for a period of a few days while en route to slaughter or pending their sale or shipment. Therefore, employees employed in these places in feeding and caring for the constantly changing group of animals cannot reasonably be regarded as "raising" livestock....

29 C.F.R. § 780.121 (citation omitted). With the understanding of the agriculture exemption obtained from these precedents, the court turns to the applicability of that exemption to Baldwin's employment as a "Sow Farm Technician" at ISF's "Sow Site # 14."

### 3. *Applicability of the exemption here*

Pursuant to the analysis used in *Holly Farms,* the court begins with the question of whether ISF was engaged in "primary" agriculture. *Holly Farms,* 517 U.S. at 399–400, 116 S.Ct. 1396. "Primary" agricultural activities are those listed in the first clause of 29 U.S.C. § 203(f). *Id.* at 398, 116 S.Ct. 1396 (" 'Primary farming' includes the occupations listed first in § 3(f)."); *Farmers Reservoir & Irrigation Co.,* 337 U.S. at 762, 69 S.Ct. 1274 ("Certain specific practices ... are listed as

being included in this primary meaning."); 29 C.F.R. § 780.105(b) ("First, there is the primary meaning [of 'agriculture']. This includes farming in all its branches. Listed as being included 'among other things' in the primary meaning are certain specific farming operations"). The statutory definition specifically identifies "the raising of livestock" as a "primary" agricultural activity. 29 U.S.C. § 203(f). Indeed, it is the only activity concerning livestock listed as "primary" agriculture. *See Hearnsberger,* 435 F.2d at 929 ("The only activity as to livestock listed within the 'primary' meaning of agriculture is 'the raising of livestock.' "). Furthermore, "swine" are identified in the regulations as "livestock" to which this definition of primary agriculture applies. *See* 29 C.F.R. § 780.120.

Baldwin argues, however, that the "industrialized" hog production activity of ISF should not come within this category of "primary" agriculture. *Cf.* 29 C.F.R. § 780.119 ("Employees are employed in the raising of livestock ... only if their operations relate to animals of the type named and constitute the 'raising' of such animals."). Much authority is to the contrary. As the Supreme Court noted, "[n]owhere in the Act was any attempt made to draw a distinction between large and small farms or between mechanized and non-mechanized agriculture. In fact, the very opposite appears...." *Maneja,* 349 U.S. at 261, 75 S.Ct. 719. ISF's method of hog production may be somewhat extraordinary, but "[w]here a farmer thus uses extraordinary methods, we must look to the function performed." *Id.* Therefore, the question is whether ISF, whatever the manner in which it has organized its hog production, is still performing the function of "raising of livestock." *Id.*

Again, the pertinent regulations define "raising" of livestock as "includ[ing] such operations as the breeding, fattening, feeding, and general care of livestock." 29 C.F.R. § 780.121. This is precisely the list of activities in which ISF engages and precisely the list of tasks Baldwin was employed to perform. ISF breeds, feeds, and fattens hogs from artificial insemination to "finishing" and marketing, and Baldwin was employed to provide "general care" for those hogs for a

portion of their development. *See* Defendant's Statement of Undisputed Facts, (unnumbered exhibit, Bates # 0095).

Baldwin argues that by breaking down the "raising" of hogs into separate stages, ISF lost its agriculture exemption. This argument is unpersuasive on at least two grounds. First, 29 C.F.R. § 780.121 recognizes that "feeding and care of livestock does not necessarily or under all circumstances constitute the 'raising' of livestock," and gives as an example that does not fit the definition of "raising" livestock feeding and caring for animals in stockyards or corrals of a meat packing plant pending slaughter or shipment. The regulation also states that "feeding and fattening livestock in stock pens where the livestock remains for a *substantial period of time*" is "raising" livestock. 29 C.F.R. § 780.121 (emphasis added). Although pigs are only at ISF's sow farms, such as the one at which Baldwin was employed, for approximately sixteen days, ISF's activities do not fall outside the meaning of "raising" livestock as explained in this regulation, because the hogs nonetheless remain in ISF's care "for a substantial period of time." The relatively short period of time that pigs stay at the sow farms is prior to weaning, not prior to slaughter, and the hogs then remain within ISF's control, are fed and cared for by ISF employees, until they reach market weight. Second, to the extent Baldwin asserts that ISF's hog production is "separately organized" as "independent productive activity," because it is divided into separate production stages punctuated by moving swine to different "farms," *Farmers Reservoir & Irrigation Co.*, 337 U.S. at 760–61, 69 S.Ct. 1274, she has misconstrued *Farmers Reservoir & Irrigation.* ISF engages in the complete process of raising livestock and maintains ownership and control over the hogs their entire lives; it does not perform some discrete function, such as catching and delivering the hogs to the processing plant. *Compare Holly Farms,* 517 U.S. at 400, 116 S.Ct. 1396 (live-haul crew performed a discrete function "aligned" with slaughter, not raising of livestock); *with Wirtz v. Tyson's Poultry, Inc.,* 355 F.2d at 260 (a corporation carried on and headed up a single and completely integrated farming

operation, and maintained the ownership of the eggs and egg-producing birds throughout the process, and thus the assembly, grading, handling, sizing, candling, packing, and shipping of eggs obtained from an affiliated corporation were within the agricultural exemption). Instead, everything ISF does is "carried on as part of the agricultural function" of raising livestock, and ISF engages in the entirety of that function. *Farmers Reservoir & Irrigation Co.,* 337 U.S. at 761, 69 S.Ct. 1274.

■ Therefore, ISF's hog production meets both prongs of the pertinent inquiry concerning whether it is engaged in the "primary" agricultural activity of "raising livestock," because its operations "relate to animals of the type named and constitute the 'raising' of such animals." 29 C.F.R. § 780.119. Baldwin's further argument that ISF's hog production is not by a "farmer" and not on a "farm" also misses the mark according to pertinent case law and regulations, because these are not requirements of "primary" agriculture. *See Holly Farms,* 517 U.S. at 400, 116 S.Ct. 1396 (considering whether an activity is by a "farmer" or "on a farm" as pertinent only to determining whether the activity is "secondary" agriculture); *see also* 29 C.F.R. § 780.105(b) ("If an employee is employed in any of these ["primary"] activities, he is engaged in agriculture regardless of whether he is employed by a farmer or on a farm," citing *Farmers Reservoir & Irrigation Co.*).

Because the court concludes that there is no genuine issue of material fact and that, as a matter of law, ISF's activities—and Baldwin's activities for ISF in particular—constitute "primary" agriculture, the court need not pass on to the question of whether any of ISF's activities are also "secondary" agriculture. *Cf. Holly Farms,* 517 U.S. at 400, 116 S.Ct. 1396 (considering whether the employer was engaged in "secondary" agriculture only because the court found the activities in question were not "primary" agriculture). Although there may be some appeal to Baldwin's assertion that industrialized hog production operations that bear a greater resemblance to Ford Motor Company than to a "farm" should not be able to invoke the

"employed in agriculture" exemption from overtime pay requirements of the FLSA, that argument is better addressed to Congress than to this court in light of the language of the statute and the governing interpretations.[3]

### III. CONCLUSION

Because the court concludes, as a matter of law, that ISF was and is engaged in "primary" agriculture within the meaning of 29 U.S.C. § 203(f)—the raising of livestock—and Baldwin was specifically engaged in that activity, Baldwin falls within the exemption to the FLSA's overtime pay requirements for any "employee employed in agriculture" in 29 U.S.C. § 213(b)(12). Consequently, ISF is entitled to partial summary judgment on Count IV of Baldwin's complaint, the FLSA claim.

Therefore, ISF's March 2, 1998, motion for partial summary judgment on Count IV of Baldwin's complaint is **granted** and that count is **dismissed.**

**IT IS SO ORDERED.**

---

3. In light of the application of federal precedents and federal regulations to the question of interpretation of this federal statute, the court finds it unnecessary to consider either Baldwin's arguments based on decisions of the Iowa Supreme Court in state law cases or ISF's arguments that those state decisions have been overruled.